1   DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO

2   Case No. 2007CV10808, Division/Courtroom 18
    _____

3
        INDIVIDUAL AND RULE 30(b)(6) DEPOSITION OF:
4            DAVID HAMILTON - February 7, 2011
               Marquis Investments, Inc.
5   _____

6   STEPHEN P. GALLAGHER, individually; EMERALD ISLE
    PROPERTIES, LLC, a Colorado limited liability company;
7   GGBC II INVESTMENT PROPERTIES, LLC, a Colorado limited
    liability company; JOSEPH F. LAMBRIGHT, individually;
8   EMERALD ISLE GREELEY, LLC, a Colorado limited
    liability company,

9
    Plaintiffs,

10
    v.

11
    MERCURY CAR WASH, INC., a Colorado corporation;
12  MARQUIS INVESTMENTS, INC., a California corporation;
    DANIEL L. ROBERTS, individually; and MCW DEVELOPMENT,
13  LLC d/b/a MERCURY CAR WASH DEVELOPMENT, LLC, a
    Colorado limited liability company; DAVID HAMILTON,
14  individually,

15  Defendants.

16  MARQUIS INVESTMENTS, INC.,

17  Third-Party Plaintiff,

18  v.

19  NORMA WALKER; GGBC INVESTMENT PROPERTIES, LLC, a
    Colorado limited liability company; EMERALD ISLE
20  LENDING COMPANY, a Colorado corporation; THE BROKERS
    GROUP, LLC, a Colorado limited liability company,

21
    Third-Party Defendants.

22
    AND

23
    Case No. 2008CV4527, Courtroom 19

24

25

1   EMERALD ISLE PROPERTIES, LLC, a Colorado limited
    liability company,
2
    Plaintiff,
3
    v.
4
    DANIEL L. ROBERTS, individually, MCW DEVELOPMENT, LLC,
5   a Colorado limited liability company; MARQUIS
    INVESTMENTS, INC., a California corporation,
6
    Defendants.
7   _____

8            PURSUANT TO NOTICE, the individual and
    Rule 30(b)(6) deposition of DAVID HAMILTON was taken
9   on behalf of the Plaintiffs and Third-Party Defendants
    GGBC Investment Properties, LLC and Emerald Isle
10  Lending Company at 730 17th Street, Suite 200, Denver,
    Colorado 80202, on February 7, 2011, at 8:58 a.m.,
11  before Marchelle Hartwig, Certified Shorthand Reporter
    and Notary Public within Colorado.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                 A P P E A R A N C E S

 2   For the Plaintiffs    BRIAN T. RAY, ESQ.
     and Third-Party       Hatch Halstead LLC
 3   Defendants:           730 17th Street
     GGBC Investment       Suite 200
 4   Properties, LLC       Denver, Colorado 80202
     and Emerald Isle
 5   Lending Company

 6   For the Defendant:    D. SEAN VELARDE, ESQ.
     Marquis               Burns Figa & Will, P.C.
 7   Investments, Inc.     6400 South Fiddler's Green Circle
                           Suite 1000
 8                         Greenwood Village, Colorado 80111

 9   Also Present:         Stephen Gallagher

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    I N D E X

2    EXAMINATION OF DAVID HAMILTON                    PAGE
     February 7, 2011
3
     By Mr. Ray                                        6
4

5                                                  INITIAL

     DEPOSITION EXHIBITS:                          REFERENCE
6
     Exhibit 1    Ground Lease Agreement Between     46
7                 Joseph F. Lambright, Individually
                  and Emerald Isle Greeley, LLC, and
8                 Marquis Investments, Inc., and
                  Mercury Car Wash, Inc., 2/28/07
9
     Exhibit 6    Option To Purchase Real Property,  54
10                2/23/07

11   Exhibit 12   Ground Lease Agreement Between     83
                  Emerald Isle Properties, LLC, and
12                Marquis Investments, Inc., and
                  Mercury Car Wash, Inc., 4/20/07
13
     Exhibit 20   Ground Lease Agreement Between     68
14                GGBC II Investment Properties,
                  LLC, and Marquis Investments, Inc.,
15                and Mercury Car Wash, Inc., 4/9/07

16   Exhibit 22   Option To Purchase Real Property,  70
                  4/9/07
17
     Exhibit 25   Subordination Of Deed Of Trust,    61
18                2/28/07

19   Exhibit 34   Promissory Note, 7/20/07           91

20   Exhibit 37   Notice of Deposition of David       6
                  Hamilton
21
     Exhibit 38   Notice of C.R.C.P. 30(B)(6)         7
22                Deposition of Marquis Investments,
                  Inc.
23
     Exhibit 39   Summary of Relationship between    13
24                Marquis and Mercury and
                  Transactions Contemplated
25

5

1    Exhibit 40   Promissory Note, 1/19/06                    31

2    Exhibit 41   Marquis Investment, Inc.'s and            96
                  David Hamilton's Answer,
3                 Counterclaims, Cross-Claims,
                  and Third-Party Complaint and
4                 Jury Demand

5    Exhibit 42   Marquis Investment, Inc.'s and           174
                  David Hamilton's Responses to
6                 Plaintiff's First Set of
                  Interrogatories and Requests
7                 for Production of Documents,
                  and Amended Responses to
8                 Requests for Admission

9    Exhibit 43   E-mail to Marquisinv@aol.com             192
                  from Roberts, 11/19/07,
10                Subject:  Lease Actions

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID HAMILTON

```
 1              WHEREUPON, the following proceedings were

 2   taken pursuant to the Colorado Rules of Civil

 3   Procedure.

 4                 *     *     *     *     *

 5              (At this time Mr. Gallagher was not

 6   present.)

 7                       DAVID HAMILTON,

 8   having been first duly sworn to state the whole truth,

 9   testified as follows:

10                       EXAMINATION

11   BY MR. RAY:

12        Q.   Good morning.  We have obviously had the

13   pleasure of meeting several times before, but could

14   you please state your name for the record.

15        A.   David Hamilton.

16        Q.   And, Mr. Hamilton, I'm going to hand

17   you -- we're going to actually start in a crazy order

18   with the deposition exhibits.

19              MR. RAY:  Let's go off the record for a

20   second.

21              (Discussion off the record.)

22              (Deposition Exhibit 37 was marked.)

23        Q.   (BY MR. RAY)  I'm handing you what's been

24   marked as Deposition Exhibit 37.

25              MR. RAY:  I've got copies of everything
```

DAVID HAMILTON

7

1    else for you, Sean, just not that.

2         Q.   (BY MR. RAY)  Take a quick look at that,

3    if you will.  I'll just ask if you received that

4    notice of deposition.

5         A.   Yes.

6         Q.   And you received another notice of

7    deposition for Marquis; is that correct?

8         A.   I believe so, yes.

9              (Deposition Exhibit 38 was marked.)

10        Q.   I'm handing you what's been marked as

11   Deposition Exhibit 38.  Do you recognize Exhibit 38?

12        A.   Yes.

13        Q.   Okay.  Take a minute -- and we're going

14   to go through the topics on the last page.  Just take

15   a quick look through the eight topics and tell me --

16   my question is going to be two parts:  If there is one

17   of those that you don't have personal knowledge of and

18   is there anyone else other than you for Marquis that

19   would have knowledge of any of this stuff.

20        A.   I've got personal knowledge as to item 1.

21        Q.   And confirm for me also, would there be

22   anyone else at Marquis, other than yourself, that

23   would be able to testify about these things?  It's

24   just you and your wife that are a part of Marquis; is

25   that correct?

DAVID HAMILTON

1          A.    There would not be.

2          Q.    Okay.  And 2 through 8, if you could

3   confirm that.

4          A.    Yes to No. 2.  Yes to No. 3.  Yes to No.

5   4.  Yes to No. 5.  Yes to No. 6.  Yes to No. 7, and

6   yes to No. 8.

7          Q.    Perfect.  Made my life easy.  If you want

8   to just start stacking them up to the left like that,

9   that way we can keep a bunch of them.  Okay.

10              We're going to talk in general before we

11  talk about the dissolution of Marquis, so my first

12  line of questions is to explain to me the corporate

13  structure of Marquis prior to its dissolution, who

14  were the officers, that type of stuff.

15         A.    Marquis was formed.  I was listed as the

16  president.  I was also the director of Marquis.  My

17  wife, Sharyon, S-h-a-r-y-o-n, was the secretary and

18  also a director.

19         Q.    Anyone else?

20         A.    No.

21         Q.    When was Marquis formed, approximately?

22         A.    May 11, 2004.

23         Q.    And has your wife remained an officer of

24  Marquis since its inception?

25         A.    Yes.

DAVID HAMILTON

9

1              Q.    Is she still an officer today?  Not

2    taking into account any legal impact of dissolution,

3    is she still -- have you taken her off of Marquis

4    today?

5              A.    No.

6              Q.    From May 11 -- well, when did it

7    dissolve?  When did you file -- what is it called in

8    California?

9              A.    It's a certificate of dissolution.

10             Q.    When was that filed, approximately?

11             A.    The process began on 11/26 of 2010, and

12   then I believe the certificate was mailed to the State

13   in December.

14             Q.    What starts the process?  Help educate me

15   on that.  I'm not from California.  You said on 11/26

16   the process was started.

17             A.    Yes.  The process of dissolution begins

18   with a corporate resolution to dissolve the

19   corporation.

20             Q.    And who signed that resolution?

21             A.    Sharyon.

22             Q.    Did you authorize it as well?

23             A.    Yes.

24             Q.    Okay.  Go ahead.  So you filed the

25   corporation resolution.  And was that done on

1    November 26?

2            A.    Yes.

3            Q.    Okay.   The next step is you file

4    something with the secretary of state -- or tell me

5    the next step.

6            A.    The next step is to prepare and mail the

7    certificate of dissolution.

8            Q.    And you did that when, approximately?

9            A.    In December.

10           Q.    Okay.   When is your understanding -- just

11   as the president of Marquis, not in any legal sense --

12   of when Marquis will be wrapped up or formally

13   dissolved?

14           A.    I don't know the answer to that question.

15   As I was investigating, resolutions -- dissolutions,

16   rather, sometimes take years.

17           Q.    Okay.   Why did you file for -- or why did

18   you cause the corporate resolution to be authorized

19   dissolving Marquis as an entity?

20           A.    It's intensive to run a corporation in

21   California.   You pay certain taxes whether or not

22   you're doing business or making money.   It just made

23   sense, since Marquis is not actively pursuing new

24   ventures, to dissolve.

25           Q.    Okay.   So what kind of taxes would you be

DAVID HAMILTON

1    subject to every year?

2             A.    There is a minimum tax of $850, and it

3    varies, depending on income, from that point.

4             Q.    Okay.  And that's per year?

5             A.    Per year.  Then there is an additional

6    statement of identity each year.  You have to file a

7    statement of identity and a tax fee.

8             Q.    It's no more than 100 bucks, right?

9             A.    Right.

10            Q.    So what other expense is so significant

11   for Marquis that would cause you to file for

12   dissolution?  You've got the taxes, you've got the

13   renewal fees with the State of California.  It's

14   only $1,000 -- I mean, $1,000 a month is a lot to me.

15   I'm not downplaying that, but are there any other

16   expenses?

17            A.    No.

18            Q.    Okay.  Are there any other reasons, other

19   than your incurrence of this approximate $1,000 a

20   month in expense, that caused you to dissolve Marquis?

21            A.    I will just clarify.  That was an annual

22   fee.  You said it was monthly.  Just so my testimony

23   is correct.

24            Q.    Absolutely.

25            A.    It was a business decision.  It's a

DAVID HAMILTON

1    closely held corporation.  We just decided it was time

2    to put the formality of the corporation aside.  Didn't

3    have plans for Marquis going forward, necessarily.

4         Q.   Well, I understand you made those

5    decisions.  I'm asking why.  It costs you $1,000 a

6    year to keep Marquis going.  And if that's the only

7    reason, that's fine.  You're the president.  It's an

8    acceptable decision; it's 1,000 bucks a year and you

9    don't want to pay it.

10         I'm asking:  Are there any other reasons

11   why you would dissolve the company other than Marquis

12   is not engaged in ongoing business and this $1,000 a

13   year fee?

14         A.   No.  It's just a decision to simplify

15   life and not have to continue with the corporate

16   formalities.  I've operated as a sole proprietor in

17   the past, and it just seemed to be a more comfortable

18   fit.

19         Q.   How is it easier for you?

20         A.   Well, there are certain corporate

21   regulations you have to adhere to.  You have to be

22   very cautious of commingling of funds.  You have to

23   have periodic meetings.  There is resolutions for

24   pretty much anything.  The acquisitions of land, the

25   banking activities, maintain other bank accounts, so

1   personal.

2          Q.   Okay.  That makes sense.  I'm just going

3   to come full circle on this.  Is there any other

4   reasons why you would have dissolved besides the fees

5   and it's easier on you?

6          A.   No.

7          Q.   Do you remember when -- well, we'll get

8   to that later.  I'm sorry.

9               So let's talk about the background to

10  this entire structure.

11              (Deposition Exhibit 39 was marked.)

12         Q.   This is a document I'm handing you,

13  Deposition Exhibit 39, that I got from browsing Dan

14  Roberts' thousands of pages.  Take a minute and go

15  through all of that.

16         A.   Okay.

17         Q.   I think this was attached to an e-mail

18  sent to you.  Do you recall receiving this?

19         A.   This document looks familiar, but I

20  believe I've received dozens that are similar, so I

21  don't know exactly when this one arrived.

22         Q.   Okay.  When did you first become involved

23  with what I'll call the Mercury Car Wash concept?  I

24  know the first transaction, so to speak, occurred

25  September 15, '05; is that correct?

DAVID HAMILTON

```
 1        A.   Yes.

 2        Q.   Okay.  Now, September 15, 2005, did

 3   Marquis have some 1031 properties that it owned?  This

 4   is prior to the acquisition of anything in Colorado.

 5        A.    It had some properties that it owned in

 6   Wisconsin.

 7        Q.   And were those the properties that

 8   ultimately you exchanged for the car wash properties?

 9        A.   There was -- in '05, there was only one

10   property that then exchanged into multiple properties.

11        Q.   Okay.  So why don't you explain that to

12   me.

13        A.   About July of 2005, Marquis sold a

14   20-acre parcel in California, and contemplating a

15   1031, set it up with IPX.  It was on hold, and I was

16   looking for property to exchange into.

17        Q.   Okay.  And so you found the car wash

18   properties through LoopNet?

19        A.   Yes.

20        Q.   Okay.  And which properties did Marquis

21   acquire in September of '05?  They're not listed on

22   here.

23        A.   Dahlia, Loveland.

24        Q.   And let's -- just so we're on the same

25   page, when we say "Loveland," is that the Garfield
```

1    property; do you know?

2            A.    Yes.

3            Q.    Okay.  Go ahead.

4            A.    Greeley, Bell Creek, Santa Fe.

5            Q.    Alameda?

6            A.    Yes.

7            Q.    I don't know.  Was that right?

8            A.    Lakewood.

9            Q.    Okay.

10           A.    Alameda.

11           Q.    All right.  So Marquis was the owner of

12   all six properties as of September 2005?

13           A.    Yes.

14           Q.    And as part of -- strike that.

15                 What was the purchase price for all six

16   lots, approximately?  Was it by property or was it as

17   a package?

18           A.    It was by property.

19           Q.    We don't need to break it down.  That's

20   fine.  In order to comply with 1031 requirements, did

21   Marquis receive deeds of trust from -- I'll use

22   Mercury Car Wash and MCW interchangeably today.  Did

23   you receive deeds of trust from MCW?

24           A.    No.

25           Q.    Did you sign any land leases -- or did

DAVID HAMILTON

1    you enter into any land leases with anybody

2    considering these properties as the owner?

3         A.    Yes.

4         Q.    Which ones?

5         A.    All of the ones listed.  All six.

6         Q.    Okay.  And the tenant on the lease was?

7         A.    Mercury, Inc.

8         Q.    Okay.  So for each of the properties,

9    Mercury held the lease.  What was the term of that

10   lease?  Years, not --

11        A.    I believe the initial term was 15 years,

12   and there were options at five-year increments to

13   extend.

14        Q.    What interest rate were you giving on

15   that lease?

16        A.    I believe it was nine and a quarter

17   percent.

18        Q.    Was Mercury at that time generally timely

19   with its payments?

20        A.    Yes.

21        Q.    Was Bell Creek the first property that

22   ultimately sold?

23        A.    Can you be more clear?  To Marquis?  To

24   others?

25        Q.    So Marquis owns these six properties with

DAVID HAMILTON

1    the land leases to Mercury.  At some point, wasn't it

2    the concept to sell the properties as fully built

3    units and operational car washes?  Sell it, pay you

4    off, give -- meaning you're the owner of the property,

5    pay you your money, and let Mercury use its profit to

6    go to the next facility?

7              MR. VELARDE:  Objection to form.

8              MR. RAY:  That was fair.

9         A.   Just to clarify, when you say "me," you

10   are still talking Marquis?

11        Q.   (BY MR. RAY)  Correct.

12        A.   No.  The concept was that Marquis would

13   be a long-term landlord and that Mercury Car Wash

14   would construct their facilities on Marquis land.

15   They would then either sell the facilities only and

16   Marquis would inherit a new tenant, or they would own

17   the facilities -- "they" being Mercury -- and operate

18   them.  It was never Marquis' intent to get into the

19   land and get out and move into other properties.

20        Q.   Okay.  So originally, when you acquired

21   the six properties, your expectation was just to hold

22   onto those and have them be, for instance, 30-year

23   ground lease performing, get 9 percent forever?

24        A.   Yes.

25        Q.   Okay.  Something changed along the way,

DAVID HAMILTON

18

1    because I understand that Bell Creek was sold; is that

2    correct?

3              A.    Yes.

4              Q.    Okay.  Of the six properties -- we're

5    going to kind of take them in order here, but I'm

6    trying to figure out kind of the timeline when the

7    properties changed or were sold.  Bell Creek was sold

8    approximately -- do you know when?

9              A.    Approximately July of 2006.

10             Q.    Okay.  And did Marquis sell the land?

11             A.    Yes.

12             Q.    To Mercury or to the new buyers, if you

13   recall?

14             A.    I believe it was a simultaneous closing

15   to Mercury and then to Mr. Klopka, K-l-o-p-k-a.

16             Q.    And so at that point was Marquis out of

17   that property, so to speak?  You had no other interest

18   in the property.  You sold your interest as owner?

19             A.    On that particular transaction, Marquis

20   did a seller carryback.

21             Q.    What was the total purchase price,

22   approximately?

23             A.    I would say 900,000.

24             Q.    And what was your carryback?

25             A.    I believe we did a 100 percent carryback.

1          Q.    Okay.  And have you been paid on that

2     note and deed of trust?

3          A.    Yes.

4          Q.    And was that in connection with a

5     refinance of some sort, or how did that come about?

6          A.    Actually, the note and deed of trust was

7     placed with IPX, and they held it in their name on

8     behalf of Marquis as their exchanger.  And so it

9     rested with IPX until late December of '06, and at

10    that time it was paid off by Mr. Klopka.

11         Q.    And do you know if he got it refinanced?

12    It wasn't part of the December 21, 2006, Marquis-MCW

13    exchange of properties, was it?

14         A.    It wasn't -- it was in part, because on

15    that same day, Bell Creek came forward -- as far as

16    the exchange, you have six months to complete the

17    exchange.  It was moved into exchange with the

18    December 21, '06, properties, and then all of the

19    properties were subsequently exchanged in California.

20    But Mr. Klopka, I believe, had his own construction

21    funds and did a refinance, a long-term take-out loan,

22    if you will.

23         Q.    Okay.  So Marquis was paid in roughly

24    December of '06 on Bell Creek?

25         A.    Yes.

DAVID HAMILTON

20

1          Q.   What caused you to want to sell the land?
2     You said your initial game plan was to lease it long
3     term.  What caused the first hiccup?
4          A.   Initially, Mercury Car Wash and their
5     reps indicated that they had ability to procure
6     financing for the construction and improvements, that
7     that wouldn't be a problem, so we went forward with
8     that in mind.
9               As the months went on from September '05
10    into '06 and then on to maybe May of '06, we learned
11    that they were not able to perform.  They could not
12    get the financing that they were seeking unless
13    Marquis subordinated the land to the bank.  That was
14    not acceptable.  It had never been discussed.
15              They were not able to secure private
16    financing without the same scenario of Marquis
17    subordinating.  They then looked for potential buyer
18    investors that had their own cash to 1031 exchange
19    into a building, but that proved difficult because of
20    the timing of the 1031 statute.  There are severe
21    penalties if you don't get the building constructed in
22    time, so they just had the inability to provide
23    construction financing.
24         Q.   But they were at this point -- this is
25    prior to December of '06 -- current on their lease

1    payments?

2          A.    Yes.

3          Q.    And so it was more an issue of

4    construction progress, not timeliness of lease

5    payments?

6          A.    It was lack of construction progress.

7    They didn't start on any of the sites while Marquis

8    owned it.

9          Q.    Gotcha.  So how did you think, on the

10   Bell Creek property, selling the property with pure

11   owner carryback would provide MCW some sort of funding

12   for car wash improvements?

13         A.    Prior to the Bell Creek closing, I knew

14   about Mr. Klopka.  I knew that he had been

15   preapproved, I believe, by Horizon Banks; that he

16   proved to the bank that he had sufficient funds to

17   construct the building, and that there would be a

18   take-out loan at the end.  So I felt pretty

19   comfortable with the note and deed of trust lying with

20   IPX that they would have that complete within six

21   months.

22         Q.    Well, right.  But I thought what you

23   testified was the reason we started selling the

24   properties -- not "we," but the reason you started

25   selling properties was you needed to get cash for MCW.

DAVID HAMILTON

1    I mean, isn't it -- as Exhibit -- I didn't even write

2    it down.  What is it, 37?

3              A.   39.

4              Q.   39.  Thank you.  When this shift started

5    happening, the idea to get you out from being a

6    landlord and put you into a construction lender role,

7    isn't that what -- Bell Creek, for instance, is the

8    first start of transformation of changing the concept

9    from landlord to construction lender?

10             A.   I believe that concept came after Bell

11   Creek.

12             Q.   Okay.  When did you think -- what was the

13   next -- strike that.

14                  The next property in sequence -- we got

15   Bell Creek -- then it must have been Alameda, right,

16   in terms of a sale by Marquis changing its concept

17   that I'm talking about?

18             A.   Actually, the next transaction related to

19   the five remaining properties, all but Bell Creek.

20   Not Bell Creek.  They sold simultaneously on December

21   28 of 2006.

22             Q.   So the other five sold in December

23   of '06?

24             A.   Yes.

25             Q.   All right.  You sold those properties to

1    MCW, correct?

2          A.   Yes.

3          Q.   What was the consideration?  How much

4    money did you get?

5          A.   Marquis did a -- through IPX, did a

6    100 percent carryback on those five properties.

7          Q.   Okay.  So Mercury Car Wash gave Marquis

8    notes in exchange?

9          A.   Yes.  They first went to IPX, and then

10   through the exchange process were assigned to Marquis.

11         Q.   And what was the approximate value of all

12   of those notes?

13         A.   I would say between 4 1/2 -- 4.5 to

14   5 million.  I have to refer to the documents.

15         Q.   No problem.  And so MCW owns the

16   properties.  You understood that they were actively

17   looking for tenants to lease those properties to you,

18   correct?

19         A.   Yes.

20         Q.   And that was the idea in selling the

21   properties to MCW was to get a tenant into the

22   facility to start paying rent?

23         A.   I'm not sure I follow.

24         Q.   I'm not sure I followed that.  Let me

25   start over.

1          A.    There was no facility for a tenant to pay

2     rent on that.

3          Q.    Correct.   A facility or not -- so we're

4     trying to define the concept here.   You sell the

5     properties to MCW.   You don't get any cash back out of

6     it.   You have 4 1/2 or 5 million in notes that are out

7     there.   What are those notes secured by?

8          A.    They are secured by the properties that

9     were sold to MCW and to JM Holdings.

10          Q.    So you did purely carryback financing on

11     those, correct?

12          A.    Yes, but there is more to the

13     transaction.

14          Q.    I don't want to cut you off today.   This

15     is your chance to talk.   Your counsel may advise you

16     otherwise, but . . .

17          A.    It's simply -- we alluded to the fact

18     that it was a 1031 exchange, so the notes were held by

19     IPX to facilitate a 1031 exchange on behalf of

20     Marquis.

21          Q.    Sure.   And ultimately those notes went to

22     Marquis?

23          A.    Yes.

24          Q.    And were they secured by anything other

25     than these five lots?

DAVID HAMILTON

25

1         A.   No.

2         Q.   Okay.  MCW now owns the properties?

3         A.   Yes.

4         Q.   Marquis or IPX now has notes that they

5    are owed on the properties.  How is MCW paying those

6    notes, let's say, January 1, '07, the next month when

7    it's due?  It's just ground, right?

8         A.    If you are asking where they got their

9    money, I don't know, but they did make payments.

10        Q.   You were MCW's lender, correct?  I mean,

11   throughout a lot of this process.

12        A.   Yes.

13        Q.   And so did you request financial

14   statements from MCW?

15        A.    I believe that I had an earlier financial

16   statement.  I did not request it specific to this

17   transaction.

18        Q.   Did you run a credit check?

19        A.   No.

20        Q.   Did you do any due diligence at all to

21   see whether Dan Roberts had the ability to pay back

22   $5 million worth of debt?

23        A.    Well, at that time, I knew that they were

24   into serious negotiations with Mr. Gallagher to

25   acquire at least four of the six properties.  Bell

1    Creek, having been sold for cash, I knew that cash had

2    already come out or was soon to come out.

3             Q.    From the Klopkas?

4             A.    From the Klopka refi.  And so I was --

5             Q.    But let's stop there.  Where did that

6    money go?  The Klopka money went to you, right?

7             A.    The Klopka money stayed with IPX and

8    exchanged into property in California.

9             Q.    That was yours?

10            A.    That was Marquis'.

11            Q.    MCW didn't get any cash out of the Klopka

12   deal or very little, if they got any, right?

13            A.    I don't know what they may have received

14   out of the Klopka deal.

15            Q.    Right.  And we're just trying to figure

16   out where MCW is getting sources of funds to start

17   paying $5 million and what you did to figure that out

18   beforehand.

19            And you said, Well, Bell Creek had just

20   sold.  You got all this money from Bell Creek.  That

21   wasn't going to help MCW.  That was going to help you.

22   You've got a note or property.  What did you think MCW

23   had in terms of assets or money coming in to be able

24   to pay $5 million worth of notes in early '07 if Bell

25   Creek money didn't go to MCW or some of it?

DAVID HAMILTON

27

```
1              A.    I just know that they had some other
2     sources of income.  I know that --
3              Q.    Like what?  Let's slow down.
4              A.    Ms. Walker had, at times, loaned MCW
5     money.
6              Q.    Okay.  Let's stop there.  How many loans
7     are you aware of that Ms. Walker made to MCW?
8              A.    Just one that I'm aware of.
9              Q.    So just one loan.  And how much was that
10    loan for?
11             A.    I don't know.
12             Q.    You know Ms. Walker.  It couldn't have
13    been more than $100,000, could it?
14             A.    I don't know that.
15             Q.    Okay.  And you'll agree -- I think we
16    have had this discussion in other cases -- that
17    Ms. Walker, Daniel Roberts and MCW all are the same?
18             A.    Yes.
19             Q.    I'm not putting words in your mouth.
20             A.    Yes.
21             Q.    And so if you're dealing with Ms. Walker
22    and she is telling you something, you believe that
23    that's a statement on behalf of MCW.  Is that fair?
24                   MR. VELARDE:  Objection to form.
25                   MR. RAY:  No problem.
```

1          A.   It would depend on the context of what

2     she was telling me.

3          Q.   (BY MR. RAY)  Sure.  And in these

4     contexts -- and this isn't a trick question.  In these

5     contexts, did she operate in any other context besides

6     these car washes or her broker role in these car

7     washes?

8          A.   If you melt her broker role into that

9     scenario, then she was always talking about car wash

10    properties.

11         Q.   And she was --

12              MR. VELARDE:  Can I just stop for a

13    second?  Let me just clarify one thing.  There is an

14    assumption in this line of questioning that you knew

15    Walker and Roberts and Roberts' entities were all one.

16    I think it's helpful for everybody to put that into

17    context of what time you knew that.  Did you know that

18    from the very beginning?

19         A.   No.  I thought -- I understood that you

20    were talking about now --

21         Q.   (BY MR. RAY)  Correct.

22         A.   -- given the fact that we have gone

23    through multiple depositions with these people.

24         Q.   Yeah.

25         A.   Sitting here today, I understand it.

DAVID HAMILTON

```
 1   Going into the deal in '05 and for, you know, maybe a
 2   year or so after that, I didn't know the relationship
 3   between Ms. Walker and Mr. Roberts.
 4        Q.   We'll try to make it specific with
 5   examples.  The Alameda case, before the Culley
 6   closing, for example, Norma's at the head of sending
 7   all of the e-mails that you can see, not Dan.  When
 8   you get an e-mail from Norma Walker, for instance,
 9   about the Culley closing, did you assume that was a
10   statement on behalf of MCW or did you think she was
11   operating for some other company that I couldn't even
12   think of?
13        A.   I always believed that MCW's interest was
14   contained in those communications, but at times I felt
15   that she was conveying information coming from parties
16   other than MCW and Dan Roberts.
17        Q.   Okay.  So at times, she was a
18   communication facilitator, correct, meaning --
19        A.   Yes.
20        Q.   -- passing information from one party to
21   another, correct?
22        A.   Yes.
23        Q.   Aside from those instances when she is
24   telling you MCW will agree to sell the property for
25   this, would you think that Norma Walker was acting for
```

1    MCW?

2            A.    If MCW was in the message, yes.

3            Q.    Okay.  And the same line of questioning

4    for Dan Roberts.  You understood Dan Roberts was the

5    managing member of MCW Development, LLC?

6            A.    Yes.

7            Q.    You understood he was the president of

8    Mercury Car Wash, Inc.?

9            A.    Yes.

10           Q.    And you knew that he had authority to act

11   on behalf of MCW?

12           A.    At what time frame?

13           Q.    At any time.  Even in December of --

14   September of '05, when Dan Roberts' has signed the

15   closing documents, you knew he had authority for MCW,

16   correct?

17           A.    In September of '05, I didn't know about

18   MCW.

19           Q.    Okay.

20           A.    I dealt specifically with Mercury, Inc.,

21   and it was some months later that I found out they had

22   a development company.

23           Q.    Again, I'll use Mercury Car Wash, Inc.,

24   and MCW interchangeably today.  If you think it's an

25   important distinction, feel free to keep calling it

1    Mercury, Inc., but I don't want to confuse you.  I

2    just mean Mercury.

3                So Ms. Walker loaned funds to MCW, so

4    that was one source of MCW's funds.  Where else did

5    you think they were getting money to pay you in

6    December '06?

7          A.   I know that in January of '06, they

8    pledged certain Marquis notes that they held -- notes

9    and deeds of trusts to Mr. Gallagher or one of his

10   entities in exchange for a loan.

11               (At this time Mr. Gallagher entered the

12   room.)

13               MR. RAY:  We can go off the record.

14               (Discussion off the record.)

15               (Deposition Exhibit 40 was marked.)

16               MR. RAY:  Back on the record.

17         Q.   (BY MR. RAY)  I've handed you Deposition

18   Exhibit 40.  You had just indicated you thought MCW

19   had funds from a loan from Mr. Gallagher; is that

20   correct?

21         A.   Yes.

22         Q.   Exhibit 40, is this the promissory note

23   that you're talking about?

24         A.   Yes.

25         Q.   This was in January of 2006, nearly a

1    year before the time frame you're talking about.  Are

2    you sure that MCW still had funds from this note a

3    year later?

4         A.    Well, no.  What I was telling you is

5    that's another source of money that MCW or Mercury

6    would have had in addition to the Norma Walker loan.

7         Q.    Do you know where the funds went?

8         A.    No.

9         Q.    As a lender to MCW, would it be important

10   for you to know where your debtor is spending funds

11   incurred on other obligations or on other loans?

12        A.    Well, it was represented that this money

13   was going towards the effort of constructing car

14   washes and paying car wash-related bills, and I left

15   it at that.

16        Q.    Who told you that?

17        A.    Dan Roberts.

18        Q.    Okay.  Would it be fair to say -- and

19   we're not here to defame anybody on the record.  Don't

20   worry.  Truth is a defense.  Would it be fair to say

21   that Dan Roberts has lied to you on more than one

22   occasion?

23        A.    Yes.

24        Q.    Okay.  And it's fair to say that Norma

25   Walker has lied to you on more than one occasion?

DAVID HAMILTON

```
1        A.   Yes.

2        Q.   We agree, for whatever it's worth.

3             The December 26 transaction, and now in

4    January, they're forced to start paying this 4 1/2-,

5    $5 million note.  Did they make those payments for the

6    first few months?

7        A.   Yes.

8        Q.   What did you do with the money?  I don't

9    mean like going to Home Depot or going to whatever.  I

10   mean, did you reinvest it in another project, another

11   car wash?

12       A.   Are you speaking about the monthly

13   payment funds?

14       Q.   Correct.  So you had just now sold some

15   very expensive property and you didn't get anything

16   back for it.  You got -- meaning the notes.  No cash.

17   And so when you get your monthly payments, what are

18   you using that money for?  Are you reinvesting it in

19   these car washes or just recouping your $5 million?

20       A.   I would have to say a mixture.  Certainly

21   Marquis' ongoing operating expenses, and then some of

22   the money was lent back to MCW to pay for their

23   construction efforts.

24       Q.   So MCW was out $5 million to you,

25   approximately, notewise.  And their monthly payments
```

DAVID HAMILTON

34

1     on the $5 million they owe you, you are reloaning

2     their monthly payments to them.  You are just letting

3     them acquire more debt.  Is that fair?

4          A.   No.  You have to realize -- and I know

5     timelinewise we're approaching -- but in February

6     of '07, just two months after the December closing,

7     they were able to sell the Greeley property to

8     Mr. Gallagher or one of his entities, and that

9     generated cash and paid off that note, the Greeley

10    note to Marquis, and now Marquis had some liquidity.

11         Q.   Okay.  February 2007.

12         A.   February 28.

13         Q.   You signed a lot of documents that day,

14    so I'm sure that's why you remember it so well.

15         A.    My mother passed away that day, so I'll

16    remember that day.

17         Q.   Sorry about that.

18              The next property -- strike that.

19              You have the five properties left in

20    December of '06; Dahlia, Loveland, Greeley, Alameda

21    and Santa Fe?

22         A.   Yes.

23         Q.   And now begins your process of selling

24    the properties, correct?  Marquis now is in the mode

25    of wanting to liquidate its properties like you did

1    with Bell Creek and not continue to be a landlord; is

2    that correct?

3             A.    Marquis sold its properties in December

4    of 2006.  And in early -- in January of 2007, I was

5    made aware that Mr. Gallagher was under contract to

6    buy four of the remaining five properties, and

7    Greeley, as I mentioned in February, was the first of

8    those four that he was obligated to purchase closed.

9             Q.    When did you find out about

10   Mr. Gallagher's contract on the four properties?

11            A.    Well, I actually found out that he was

12   very serious about acquiring those four properties

13   before the December '06 closing.

14            Q.    Okay.

15            A.    So basically they had a buyer in place.

16            Q.    And "they" MCW?

17            A.    MCW.

18            Q.    Okay.  So that had to be pretty good news

19   for you.  MCW comes to you and says, We've got a

20   buyer, potentially, for four more properties.  What

21   did they tell you the terms or the structure of this

22   deal, meaning the sale of the four properties, was

23   going to be?  Was it going to be a straight sale for

24   cash and Marquis gets paid off, or was it something

25   else?

1          A.    The first scenario.  A straight sale,

2    Marquis' notes and deeds of trust -- notes would be

3    paid, deeds of trust would be released relating to

4    those four properties.

5          Q.    That was the first discussion MCW had

6    with you on that?

7          A.    That was the plan going into the

8    December '06 closing.

9          Q.    Sure.  And obviously that changed at some

10   point.  So what was the first evolution, I'll call it,

11   in the deal before we go into Greeley?  Meaning, we

12   have got a deal on the table; four properties are

13   about to be sold.  You don't know when.  February '07

14   is the first property that gets sold.  And in

15   December, your plan was to -- strike that.

16          So in December your plan was to get all

17   cash for the four properties, you just said, and to

18   have the notes and deeds of trust paid off.  Going

19   into the December closing -- I'm not trying to put

20   words in your mouth.  Go ahead.

21          A.    I'll attempt to be brief, but explain it.

22   Going into the December 6 closing, I understood that

23   MCW had in place an agreement with Mr. Gallagher or

24   his entities to acquire Greeley, Loveland, Lakewood

25   and Dahlia, and that the closings would begin as early

1    as February, and that brings us up to February.

2           Q.    And you were going to get cash?

3           A.    And Marquis' notes would be satisfied by

4    those closings as they occurred.

5           Q.    Perfect.  That didn't happen, as we know,

6    meaning that structure -- or that -- I mean, there

7    was -- you ended up signing a lease of some sort, so

8    at some point there had to be a discussion about,

9    Well, you are now going to be a tenant on these leases

10   once Mr. Gallagher's property -- or once Mr. Gallagher

11   buys the properties.  When did that discussion about

12   you signing the leases come up?

13          MR. VELARDE:  Objection to form.

14          A.    Well, first, let me answer your first

15   question, and that is that when Greeley closed,

16   Marquis did get the funds.  As the subsequent three

17   properties closed -- Loveland, Dahlia and Lakewood --

18   Marquis was paid in full.  And so the plan going into

19   December of having Mr. Gallagher's entities acquire

20   those four properties, finance them, pay cash,

21   whatever he was going to do and pay Marquis off, that

22   did happen.

23          Q.    (BY MR. RAY)  So Marquis gets paid off,

24   whatever it was, for the four properties.  What did

25   you do with those funds?  Did those go into the Vectra

1   Bank account construction fund or --

2        A.   Yes.

3        Q.   And that Vectra fund, as you know, you

4   only disbursed approximately -- we'll call it -- I'll

5   give you the benefit of the doubt -- 1.9 million?

6        A.   No.

7        Q.   More?

8        A.   Yes.

9        Q.   Okay.  Just briefly.

10       A.   There were two projects.  Lakewood was

11  the first project, and there was about a million-nine,

12  maybe a little more, that was loaned out on Lakewood.

13  And then Dahlia was under construction, and I believe

14  there was somewhere around 420,000 loaned out on

15  Dahlia.  In addition to that, there was a $300,000

16  interest reserve fund that was set up and funded to

17  carry payments through what they anticipated would be

18  their closing date of Lakewood.

19       Q.   Okay.  And so that is where -- there is

20  about a million dollars left.  I guess you still have

21  Santa Fe.  It didn't sell, so maybe that's where it

22  is.

23            When did Dan Roberts come to you and say,

24  You're going to have to sign a lease as part of this

25  deal?

DAVID HAMILTON

1                    MR. VELARDE:  Objection to form.

2          A.   Well, the lease concept actually came up,

3    I believe, in early February.  I was asked to submit

4    financials and --

5          Q.   (BY MR. RAY)  By whom?

6          A.   Well, the information came from

7    Ms. Walker, but the production of these financials

8    were to benefit Mr. Gallagher or his entities.

9          Q.   Who told you that?

10         A.   Ms. Walker.

11         Q.   And what did she tell you specifically?

12         A.   Well, that Mr. Gallagher was going to his

13   bank and needed to have -- offer the bank some

14   financial records of an entity that would be basically

15   on the lease and, I believed, to show that

16   construction funds were available.

17         Q.   Mr. Gallagher never told you that,

18   correct?

19         A.   Well, we talked about the financials in

20   later months to come when --

21         Q.   Mr. Gallagher never told you that he

22   needed your financials to take to a bank in order to

23   procure funds, did he?

24         A.   I don't believe -- not in February.

25         Q.   Okay.  At any time, did you, Dave

DAVID HAMILTON

40

1    Hamilton, and Steve Gallagher have a conversation

2    about that?

3            A.    I know we talked about our financials

4    when he came to California.   I think he even had a

5    copy of the financials that I had submitted, but --

6            Q.    Did he tell you that he was going to

7    submit them to the bank and that he needed your

8    financials in order for him to keep his bank happy?

9            A.    No, not at that time, because the loans

10   had already been secured.

11           Q.    At any time did he tell you that?

12           A.    I don't know.

13           Q.    You allege that in your complaint.   We'll

14   go through this significantly.   Unfortunately, it's

15   500 paragraphs long.   That's one of the allegations

16   you are making in this lawsuit is that Mr. Gallagher

17   specifically requested from you financial statements

18   for the sole purpose of presenting them to his banks

19   to get financing.

20               And if you are sitting here today and

21   you're telling me that you can't recall a conversation

22   of when that happened or correspondence, that's fine.

23   That's an acceptable answer, but when the trial comes

24   around, we can't be having new answers to this, so

25   here's your chance.   Was there a conversation about

1    that fact that you can recall?

2          A.    I don't recall a conversation.  I recall

3    e-mail correspondence between Norma Walker and

4    Mr. Vanzant being copied to me.

5          Q.    Okay.  So the conversation was between

6    you and Ms. Walker that we talked about at the

7    beginning, correct?  This is about the issue of the

8    production of the financials.

9          A.    And I believe Mr. Vanzant was in that

10   mix.

11         Q.    In that mix.  Did you ever --

12         A.    In that conversation or that e-mail

13   stream.

14         Q.    Okay.  Did you ever have any

15   conversations with Lance Vanzant about that issue?

16         A.    I don't think I had a conversation, no.

17         Q.    And how about Holly Cook, did you ever

18   have any conversations with her about that issue?

19         A.    I don't think I met Holly at that point

20   in time.

21         Q.    So the lease idea comes up.  Who told you

22   you have to sign a lease?

23         A.    Well --

24         Q.    This is February.

25         A.    I wanted to be on the lease.  I wanted

1    Marquis to be on the lease before I would agree to

2    loan construction funds.  We were looking for a

3    security mechanism and couldn't necessarily figure out

4    how to secure Marquis' position.

5              Q.   And so take me through that.  Why did you

6    think being on the leases for Mr. Gallagher's entities

7    would help secure your position?

8              A.   It wasn't just to be on the lease.  It

9    was also to hold an option to purchase the real

10   property in conjunction with being on the lease.  And

11   the concept or the idea behind that was if MCW failed,

12   then Marquis would basically be on the lease and not

13   vulnerable to a bank's foreclosure.  And in addition,

14   the option would allow Marquis the opportunity to

15   acquire the property back.

16             So basically, if MCW folded, I would be

17   able to -- Marquis would be able to acquire the

18   property and take the project over and sell it in lieu

19   of being foreclosed out by Mr. Gallagher or his

20   entities' bank.

21             Q.   Okay.  So it sounds like it was your idea

22   to allow for the leases and for the options in order

23   to provide Marquis security?  Who came up with that

24   idea?  It sounds like a pretty creative idea.

25             A.   Well, I think -- it was my understanding

DAVID HAMILTON

43

1   going into the deal it was a mutual benefit.  On

2   Marquis' side, I just explained that.

3        Q.   Sure.

4        A.   On Mr. Gallagher's side, I was told,

5   again, probably through Ms. Walker, that that would

6   show Mr. Gallagher's bank that there actually were to

7   be funds available to construct these buildings.  That

8   was the whole idea is buy the ground, the car wash

9   would be built on top of it.  The bank's logical

10  question was, Who's funding the 1.9 million?  So that

11  was his explanation to the bank.

12       Q.   Okay.  Well, Mr. Gallagher didn't tell

13  you that, right?

14       A.   Not going in.

15       Q.   Okay.  You keep saying it's his

16  explanation to the bank.

17       A.   No.  I said Ms. Walker told me that he

18  needed Marquis' financials to go to the bank.

19       Q.   Perfect.  I'm not going to be difficult

20  today.  I just -- every time you tell me who said

21  something, I'm going to go back and confirm that it

22  was or was not Mr. Gallagher as well as Ms. Cook as

23  well as Mr. Vanzant.  It's not to be difficult.  We

24  just need to know who said what and when.

25       A.   I understand.

```
 1            Q.    So we're on the leases.  You explained to
 2      me you're very familiar with the leases.   In September
 3      of 2005, you bought properties, six of them, I
 4      believe, and simultaneously entered into ground leases
 5      with Mercury Car Wash, correct?
 6            A.    Yes.
 7            Q.    And I assume those were fairly standard
 8      car wash ground leases?
 9            A.    That was my first time of seeing them.   I
10      don't know.
11            Q.    And you were the landlord?
12            A.    Marquis, yes.
13            Q.    Sorry.  I'll just say "you," "Marquis."
14      And MCW was the tenant?
15            A.    Mercury.
16            Q.    Mercury.  As the landlord, did you expect
17      to receive monthly rental payments each month from
18      Mercury?
19            A.    Yes.
20            Q.    And what if a month came and Mercury
21      comes to you and says, Hey, I've got a problem with
22      you.  You owe me a bunch of money on a different
23      project.  Would you expect Mercury to still pay that
24      rent on that property under your lease?
25            A.    I'm not following you.
```

DAVID HAMILTON

45

```
 1          Q.    That's all right.  At some point, did
 2   Mercury stop paying its lease to Marquis -- leases?
 3          A.    Yes.
 4          Q.    What did you do once Mercury stopped
 5   paying its leases?  Did you send them a default notice
 6   saying, You haven't paid; it's untimely?
 7          A.    No, because they explained what they had
 8   in the works with Mr. Gallagher.
 9          Q.    But you knew that you had the right as a
10   landlord, if they didn't pay their rent, to evict them
11   and take the property.  You knew at least you had that
12   right as a landlord, correct?
13          A.    Yes.
14          Q.    Okay.  And you knew that because that was
15   in the lease, correct?
16          A.    Yes.
17          Q.    And you knew that at the time you signed
18   the lease, that the tenant had to pay rent, and if the
19   tenant didn't pay the rent, that the landlord had a
20   right to evict them.  You knew that before you signed
21   the lease, right?
22          A.    Yes.
23          Q.    Let's now go to the leases that you
24   signed.  You are sticking on Greeley.  Let's just stay
25   on Greeley here.
```

DAVID HAMILTON

46

```
 1              (Deposition Exhibit 1 was marked.)

 2        Q.    This is Deposition Exhibit 1.  Take a

 3   look through this, confirm that that's your signature

 4   and that that's a copy of the Greeley lease.

 5        A.    Yes.

 6        Q.    Okay.  And is this lease similar to the

 7   lease that Marquis and Mercury entered into

 8   previously?

 9        A.    Yes.

10        Q.    Similar.  So you were familiar with the

11   terms of this lease before you signed it?

12        A.    Yes.

13        Q.    Okay.  And you knew -- you know what a

14   tenant is, right?

15        A.    Yes.

16        Q.    What's a tenant?

17        A.    Well, a tenant is a party of the lease

18   that is going to occupy the property.  And in this

19   particular case, there was going to be a facility

20   constructed.

21        Q.    And the tenant has to pay the rent?

22        A.    Yes.

23        Q.    Marquis is a tenant under this lease,

24   correct?  Look at the last page.  That's your

25   signature, David Hamilton, President?
```

1          A.    Yes.

2          Q.    Okay.  Go to Section 3.1, the base rent.

3    It says the annual base rent -- I'm paraphrasing -- is

4    $78,625.  Do you see that?

5          A.    Yes.

6          Q.    Why didn't you pay that?

7          A.    Because on this particular deal, my role

8    was -- Marquis' role was as a lender, and it was not

9    my responsibility to pay this.

10         Q.    We just got done saying that -- from your

11   own words -- that tenants are responsible to pay

12   monthly rent.  That's what you just said.  Do you

13   remember that?  We can have her read it back, if you

14   would like.

15         A.    I remember saying the tenants.

16         Q.    Do you remember also saying you were a

17   tenant on this lease?

18         A.    Yes, but I also explained the purpose of

19   being listed as a tenant on the lease.

20         Q.    Well, you testified that you understood,

21   based on an identical lease that you entered into --

22   almost an identical lease you entered into with

23   Mercury before, that when you sign a lease as a

24   tenant, you have an obligation to pay rent.  You

25   testified to that, correct?

1            A.    Relating back to September '05, yes.

2            Q.    Relating to this.  I had just asked you,

3    Marquis was a tenant under this lease and you said

4    yes, correct?

5            A.    Yes.

6            Q.    Okay.  You also said that tenants are

7    responsible for paying rent, correct?

8                  MR. VELARDE:   Object to form.

9            A.    Yes, and one of the tenants was

10   responsible for paying rent.

11           Q.    (BY MR. RAY)  And why aren't you

12   responsible for paying rent?

13           A.    Because for Marquis, this is a

14   security --

15           Q.    Let him object to form.  I wasn't trying

16   to trick you.

17                 MR. VELARDE:   I'm going to object to

18   form.

19                 MR. RAY:   Thank you.

20                 MR. VELARDE:   Take a second and just let

21   me hear the question.

22                 MR. RAY:   Could you read back my

23   question?

24                 (The last question was read back as

25   follows:  "And why aren't you responsible for paying

1    rent?")

2          Q.    (BY MR. RAY)  Let's go to -- well, let's

3    go to the first page of the lease -- or the first page

4    of where it starts.  In this first paragraph here, it

5    says, Marquis Investments and Mercury Car Wash, Inc.

6    Do you see how that's defined as "tenant"?

7          A.    Yes.

8          Q.    So for this entire document, when it says

9    "tenant," it's referring to Marquis and Mercury Car

10   Wash.  I'm not asking you to agree with that, that's

11   just how this is drafted.  Okay?

12         A.    Yes.

13         Q.    Turn to page 3 for me, the second full

14   paragraph.  Let's just start with the very first

15   sentence.  "Base rent shall be paid by Tenant to

16   Landlord in equal monthly installments."  Do you see

17   that?

18         A.    Yes.

19         Q.    So explain to me again why Marquis,

20   that's a tenant under this lease, is not responsible

21   for paying rent?

22               MR. VELARDE:  Objection to form.

23         A.    Because going into this transaction,

24   Marquis, known by all parties, was to be a

25   construction lender.  This was a security instrument

1    to Marquis.  And in addition, Marquis held an option

2    to buy the property.  That was the other leg of the

3    security agreement.

4              Q.   (BY MR. RAY)  Sure.  We'll talk about

5    that later.  We're talking about this.  Did someone

6    promise you that you wouldn't be responsible for this

7    going into this?  You said this was part of the deal.

8    I'm trying to understand what the deal was.  Did

9    someone come to you and say, Hey, just sign on this

10   line and we'll rip it up later?  What caused your

11   understanding that you weren't liable under this

12   lease?

13             A.   That all parties knew that Marquis was on

14   this as a construction lender and would only pick up

15   if MCW failed, left the country.

16             Q.   MCW has failed, so now why aren't you

17   responsible?

18             A.   Well, there have been other events.

19             Q.   Such as what?

20             A.   Such as the Lakewood closing.

21             Q.   How does that get you out of the Greeley

22   lease?  Why does that impact your liability here?  I'm

23   trying to understand who told you, or did you tell

24   somebody before you signed the Greeley lease, that you

25   weren't responsible?  Let's be very clear.  Did you

DAVID HAMILTON

51

1     tell Mr. Gallagher that, Hey, I'm signing this lease

2     but I'm not going to pay?  Did you tell Mr. Gallagher

3     that?

4              A.   No.

5              Q.   Did you tell Ms. Cook that?

6              A.   No.

7              Q.   Did you tell Lance Vanzant that?  I've

8     read all the e-mails.  I spent all weekend looking at

9     15,000 pages.  That was a beautiful document.  I don't

10    mean that in a bad way.  It was very responsive,

11    but --

12             A.   I don't recall.  I know there was e-mail

13    exchange between Mr. Vanzant and myself, but I don't

14    recall specifically that topic.

15             Q.   I have not seen an e-mail from you to

16    Lance saying that you're not responsible.  So you

17    don't recall one off the top of your head?

18             A.   No.

19             Q.   Okay.  So that leaves two other people.

20    Did you tell Norma Walker that, Hey, I'll sign this

21    lease, but I'm not going to pay for it?

22             A.   Actually, I believe in an e-mail she told

23    me, essentially, MCW would be responsible for this

24    lease payment.

25             Q.   Okay.  So Ms. Walker was the party that

1    told you that you wouldn't be liable under the Greeley

2    lease; is that correct?

3          A.    That's one I can remember distinctly,

4    yes.

5          Q.    Can you remember anybody else telling you

6    anything about that?

7          A.    I think Mr. Roberts.

8          Q.    So it was MCW, fair to say, who told you,

9    either Mr. Roberts or Ms. Walker, that you wouldn't be

10   liable under the lease, correct?

11         A.    Yes.

12         Q.    No one from the landlord's side, either

13   Emerald Isle Greeley or Joseph Lambright ever told you

14   that you would not be responsible for the Greeley

15   lease, correct?

16         A.    Not that I recall.

17         Q.    Okay.

18               MR. RAY:  Let's go off the record for one

19   second.

20               (Discussion off the record.)

21               MR. RAY:  Back on the record.

22         Q.    (BY MR. RAY)  Paragraph 22.5.  Go ahead

23   and take a minute and read that paragraph.

24         A.    I'm familiar with this paragraph.

25         Q.    Okay.  So you just got done testifying

DAVID HAMILTON

53

1    that Ms. Walker told you before you signed the lease

2    that you wouldn't be responsible, that whatever these

3    words really mean, forget about it.  You're not going

4    to be responsible.  You read the lease before you

5    signed it, correct?

6          A.    Yes.

7          Q.    Okay.  And paragraph 22.5 says, second

8    sentence in, "It is mutually acknowledged and agreed

9    by Landlord and Tenant that there are no verbal

10   agreements, representations, warranties or other

11   understandings affecting, quote, the same," which is

12   this lease.  Do you see that?

13         A.    Yes.

14         Q.    Okay.  So you signed this document

15   agreeing at the time that no one had promised you

16   something different than what was contained in this

17   document, correct?

18         A.    Yes.

19         Q.    Okay.  And so why now are you saying

20   there is a different deal, when at the time you

21   knew -- you reviewed this carefully, it was the same

22   as the previous lease, you knew that if she told you

23   something different or even if Mr. Gallagher told you

24   something different, that this is what would control?

25         A.    Well, I was told before and after

DAVID HAMILTON

54

1    entering into this, and the way it actually happened

2    was that Marquis funded money through its Vectra

3    construction account to MCW and MCW made the lease

4    payments.

5         Q.    Okay.

6               (Deposition Exhibit 6 was marked.)

7         Q.    I've handed you what's been marked as

8    Deposition Exhibit 6.  This is the option you received

9    on Greeley, correct?

10        A.    Yes.

11        Q.    Does that look like a signed copy of it?

12        A.    Yes.

13        Q.    When did you receive a copy of this?

14        A.    I believe it was just about February 28.

15   Shortly after, maybe.

16        Q.    Why didn't you record it?

17        A.    I didn't receive the original and --

18   eventually this was recorded.

19        Q.    Okay.  Are you familiar with electronic

20   recording?

21        A.    Yes, but I was not capable of doing

22   electronic.

23        Q.    You were capable of doing electronic and

24   slapping a lis pendens on Mr. Gallagher's property

25   less than two months ago.  I don't mean that in a

DAVID HAMILTON

55

 1    negative way.  You're obviously familiar with the

 2    electronic property filings, no?

 3             MR. VELARDE:  Objection to form.

 4        A.   I don't agree that there was an

 5    electronic filing.

 6        Q.   (BY MR. RAY)  Okay.  So --

 7        A.   Unless you know something I don't,

 8    but . . .

 9        Q.   When did this get recorded?  I don't mean

10    an exact date.

11        A.   You know, I know I produced the recorded

12    version of this to you, but I honestly don't remember.

13        Q.   Did you record it?

14        A.   It was recorded at my request, but I did

15    not physically record it.

16        Q.   It was recorded at your request.  Who did

17    you request it to be recorded?

18        A.   My attorney.

19        Q.   Fair enough.  Approximately how long

20    after?

21        A.   I'm thinking maybe around October,

22    November of '07.

23        Q.   Okay.

24        A.   Don't hold me to that, but that's my best

25    recollection.

DAVID HAMILTON

1        Q.    After the transaction, did you call

2   Mr. Gallagher and say, Please record my option?

3        A.    Again, it was my understanding -- and I

4   have e-mails to the effect from Ms. Walker -- that the

5   originals would be recorded.  And some months later,

6   after learning that they had not been recorded, I

7   asked her again.  She was going to follow up on that.

8   Some time went by and it didn't get recorded.  And

9   then I learned, which is totally contrary to

10  California, that copies of documents can be recorded

11  in Colorado.  I wasn't -- I thought you needed the

12  original, because you do in California.

13       Q.    So let's be clear.  Ms. Walker was the

14  person that told you that that document would be

15  recorded, correct?

16       A.    Yes.

17       Q.    Mr. Gallagher never told you that that

18  option to purchase would be recorded, did he?

19       A.    Not that I recall.

20       Q.    Ms. Cook never told you that that option

21  to purchase would be recorded?

22       A.    Not that I recall.

23       Q.    Did you ever ask -- I think you testified

24  no; you never asked Mr. Gallagher or Emerald Greeley

25  to record that option, correct?

1          A.    No.

2          Q.    So when you state in your complaint that

3    Emerald Greeley and Mr. Gallagher refused to record

4    the original Greeley option, that's not accurate, is

5    it?  They never refused to do that.  You never asked

6    them?

7          A.    Well, I did ask them through Ms. Walker

8    and the documents.

9          Q.    We're talking about your communications

10   with Emerald Greeley.  You just got done testifying

11   that Norma Walker is with MCW.  We agree with that.

12   You're telling the Court that Mr. Gallagher refused to

13   do something.  And I'm asking you, did you ever ask

14   him to do that?

15         A.    Not directly.

16         Q.    Okay.  So how can you say that he refused

17   to do something that you never asked him to do?

18         A.    I made the request and the document

19   didn't get recorded.  That would be, you know,

20   something that someone else would have to answer as

21   far as their discussions with him.

22         Q.    Okay.  So we're in agreement that Emerald

23   Greeley and Mr. Gallagher did not refuse to record the

24   original option.  We're in agreement with that

25   statement, correct?

1          A.   I don't know if they refused or did not

2    refuse.  I just know that the document did not appear

3    on the public record.

4          Q.   Well, I'm not being difficult, but when

5    you state something to the Court -- you say "upon

6    information and belief," and so I need a definitive

7    answer -- I think we're on the same page -- that

8    Emerald Greeley and Mr. Gallagher did not refuse to

9    record the Greeley option.

10         A.   He did not tell me that they would not

11   record the Greeley option.

12         Q.   It's very important to keep our

13   parties -- and for me, I'm interchanging them as well.

14   Okay.  So the Greeley option was recorded.  It expired

15   February 28, 2008, correct?

16         A.   Yes.

17         Q.   You didn't exercise your option, correct?

18         A.   Correct.

19         Q.   Okay.  So had it been recorded or not,

20   Marquis didn't take the steps necessary to even

21   exercise this, correct?

22         A.   Correct.

23         Q.   Do you remember that we evicted you from

24   the Greeley property?  "You" being Marquis.

25              MR. VELARDE:  Objection to form.

DAVID HAMILTON

1          A.    I believe so.

2          Q.    (BY MR. RAY)  Do you remember your lawyer

3     filing a confession stipulating to possession?

4          A.    I seem to recall that document, yes.

5          Q.    And you acknowledge that you had to

6     surrender possession of the property, because neither

7     MCW nor Marquis had paid rent, correct?

8          A.    Yes.

9          Q.    And for you to stay there at the

10    property, Marquis, you would have had to keep paying

11    rent, right?

12              MR. VELARDE:  Objection to form.

13         A.    Once MCW was evicted, they being our

14    borrower, there was no reason for Marquis to stay.

15              MR. RAY:  Okay.  Can we take a quick

16    bathroom break?

17              (Recess taken, 10:20 a.m. to 10:29 a.m.)

18         Q.    (BY MR. RAY)  Colfax must have happened

19    around the same time as Greeley, because I see a

20    subordination agreement, January of '07.  Does that

21    ring a bell?

22         A.    Colfax actually sold in the September '06

23    group.

24         Q.    Sold -- did you ever buy it, Marquis?

25         A.    Yes.  It wasn't in the first six that

DAVID HAMILTON
60

1    we -- yes.  We bought it in April of '07 -- '06.

2              Q.   April '06.  Mercury had a lease?

3              A.   Yes.

4              Q.   Then did you sell it?  You must have sold

5    it back to Mercury at some point; is that correct?

6              A.   MCW.

7              Q.   MCW.  And when was that?

8              A.   December '06.

9              Q.   And was that financed purely through a

10   carryback?

11             A.   Yes.  The same way the previous -- or the

12   other properties that we discussed.

13             Q.   I understand Mr. Gallagher's entities

14   made a loan on Colfax.  When did that come into play

15   after MCW bought the property?

16             A.   I don't know.  I thought they made more

17   than one loan, so I don't know.

18             Q.   So Marquis has, in December of '06, a

19   deed of trust on Colfax, correct?

20             A.   Through IPX, yes.

21             Q.   Do you still have that deed of trust

22   today?

23             A.   Yes.

24             Q.   It's still live?

25             A.   Yes.

DAVID HAMILTON

61

```
1              Q.   Have you seen a release of that deed of
2    trust signed by Mr. Roberts?  I don't have it in front
3    of me.  I have it in my office.
4              A.   I'm confused why Mr. Roberts would
5    release a deed of trust held by Marquis.
6              Q.   That's a good question.  So Emerald made
7    a loan on the property.  Marquis also had a deed of
8    trust on the property, and your deed of trust -- or
9    no.  Okay.
10             (Deposition Exhibit 25 was marked.)
11             Q.   Exhibit 25.
12             MR. VELARDE:  I'm sorry.  Did you say 25?
13             MR. RAY:  I did.  However, I may have
14   just handed you the wrong one.
15             Q.   (BY MR. RAY)  Why did you sign this
16   subordination agreement?
17             A.   Because Marquis was going to receive a
18   portion of its deed of trust.  By the way, this
19   relates to Lakewood.
20             Q.   This does, correct.  You signed similar
21   ones for Colfax and Santa Fe, correct?
22             A.   We're talking about Colfax, so we're
23   switching into --
24             Q.   I gave you the wrong one, I'll be honest.
25             A.   I will just tell you on this one that
```

DAVID HAMILTON

1    Mr. Gallagher made a loan of -- I believe it was

2    $630,000 to MCW.  Marquis received the principal

3    reduction on its note and deed of trust of $488,250.

4         Q.   On Lakewood?

5         A.   On Lakewood.  This was prior to GGBC

6    acquiring the property in April.

7         Q.   Okay.  So you signed a similar one for

8    Colfax, correct, a similar subordination agreement?

9         A.   It was -- yes.

10        Q.   Okay.  And were you aware that Emerald

11   Isle made a loan to Mercury Car Wash regarding the

12   Colfax property for 573,000?

13        A.   Yes.

14        Q.   Okay.  You don't need a copy of that.

15   You're aware there is a promissory note of April 26,

16   2006?  You can take my word for that.

17        A.   Yes.

18        Q.   Now, were you aware -- I'll pull it for

19   you, no problem -- that on February 28 of '07, Mercury

20   gave Emerald Isle a deed of trust on Colfax?

21        A.   Yes.

22        Q.   Okay.  And you had a deed of trust at

23   that time on the property, as well, from December

24   of '06, correct?

25        A.   Yes.

DAVID HAMILTON

63

1          Q.   Okay.  And so you had two competing deeds

2     of trust and you signed a subordination agreement.

3     Why did you sign a subordination agreement

4     subordinating Marquis' interest on Colfax to Emerald

5     Isle?

6          A.   Colfax was made up of three parcels.  One

7     parcel was sold to a third party, and Marquis did a

8     partial release to allow that to happen.  On the other

9     two properties, Marquis signed a subordination

10    agreement subordinating on one parcel and then stated

11    first position on the second.

12         Q.   Okay.  There is ten lots.  Are you saying

13    one parcel is six lots, the other parcel four lots?

14         A.   You know, I don't know how they break

15    down.  There were, from years past, ten lots, ten

16    small lots.  My dealings with them were comprised of

17    three collective parcels, and one was sold to a third

18    party, another was subordinated to, and the third,

19    Marquis has a first position on.

20         Q.   Why did you only subordinate one of the

21    parcels and not the other?

22         A.   Well, Mr. Gallagher would be in a first

23    position on one.  I would be in the first position on

24    another.  Collectively those two parcels -- they

25    needed to merge to build the car wash.  So I felt

1   pretty comfortable that he, Mr. Gallagher, wouldn't go

2   out and build a car wash without my participation and

3   vice versa, because the parcels had to be merged.

4           Q.   Isn't it true that Ms. Walker told you

5   that Mr. Gallagher was requiring subordination of all

6   of the lots and all of the parcels?

7                MR. VELARDE:   Objection to form.

8           A.   No, I don't remember that.

9           Q.   (BY MR. RAY)   You don't.  So would that

10  be another lie that Norma Walker would have said, or

11  is it just you don't remember and you can't dispute

12  what she said?

13               MR. VELARDE:   Objection to form.

14          A.   Well, I can see that I was sent a

15  subordination document.  I reviewed it.  It seemed to

16  be -- its terms seemed to be what I had in my mind as

17  to what I would agree to, and I signed it.

18          Q.   (BY MR. RAY)   Okay.  And so when

19  Mr. Gallagher's entities made the loan in February --

20  or has this deed of trust in '07, where do you think

21  those funds went?  Did Marquis receive a paydown?

22          A.   No.

23          Q.   Did Marquis receive a paydown on Colfax

24  ever, other than the sale?

25          A.   No.

1          Q.    But Marquis is still paying every month

2    on its carryback notes, right, the 5 million owing in

3    December of '06?  This is in January, February.  They

4    are still giving you monthly payments, right, you

5    testified?

6               MR. VELARDE:  Objection to form.

7          A.    Can you repeat that question?

8          Q.    (BY MR. RAY)  No problem.

9               MR. VELARDE:   I think you said "Marquis."

10         A.    That's what confused me.

11         Q.    (BY MR. RAY)  You testified that after

12   the December 2006 transaction, there was carryback

13   financing involved and that in subsequent months,

14   Mercury made payments, because Mr. Gallagher, you

15   knew, was on the hook, had a deal coming to buy the

16   four properties that you had talked about the early

17   part of 2007.  You said you didn't get paid on Colfax.

18   You have this outstanding deed of trust.  Was Mercury

19   not paying Marquis its loan on Colfax?

20         A.    I think you misstated.  Because the

21   question you asked was, did Marquis make the payments.

22   So you're asking now did Mercury make the payments on

23   Colfax in addition to the others?

24         Q.    Yes.

25         A.    They did.

DAVID HAMILTON

1        Q.   They did.  And so you have received

2   payment on account of that deed of trust?

3        A.   Yes.

4        Q.   I thought you just said you hadn't.  I'm

5   just trying to understand.

6        A.   But you --

7        Q.   I'm not trying to trick you, trust me.

8        A.   Your question started out with did

9   Marquis pay and --

10        Q.   And then I changed it.

11        A.   If you changed it, Marquis did receive

12   payments for a time on the Colfax property.

13        Q.   Okay.  And what do you think that balance

14   is down to, approximately?  I'm not holding you to it.

15        A.   Oh, I think it grew, because it was an

16   interest-only payment to begin with, and when they

17   stopped paying, then interest continued to accrue, so

18   I would have to go back and look.  I haven't visited

19   Colfax for a number of months.

20        Q.   Okay.  Have you seen any e-mails that

21   suggest that you were only intending to subordinate

22   part of the lots on Colfax as opposed to all of them?

23   Did you ever tell Norma Walker, Hey, I'm only going to

24   subordinate to a few of these?

25        A.   I would have to look back through e-mail.

DAVID HAMILTON

 1    I know Marquis agreed to release one property.

 2          Q.    Then Alameda and Dahlia both closed

 3    4/9/07, something like that?

 4          A.    Yes.

 5          Q.    Was Loveland-Garfield part of that as

 6    well, or was that a little later?  I forget.

 7          A.    Loveland, I believe, was on

 8    April 20, '07.

 9          Q.    So we'll call them the April deals.  So

10    you sold three properties:  Dahlia, Alameda and

11    Loveland around April of '07; is that correct?

12          A.    No.

13          Q.    MCW sold.  MCW acquired them in December

14    of '06, correct?

15          A.    Yes.

16          Q.    And then did MCW have leases with other

17    tenants that you were aware of?

18          A.    Not that I'm aware of.

19          Q.    Okay.  And in April, Mr. Gallagher's

20    entities acquired these three properties from MCW,

21    correct?

22          A.    Yes.

23          Q.    And, again, I assume, like on Greeley, it

24    was your idea for the release of the security with the

25    option to sign on them, is that correct?  Similar to

DAVID HAMILTON

68

1    Greeley?

2         A.   Yes.

3         Q.   Okay.  Let's just be brief here.  What

4    I'm going to do to try to save us some time here, I'm

5    not going to hand you any copies.  This is going to be

6    real easy.  I'm handing you Exhibit 20.

7              (Deposition Exhibit 20 was marked.)

8         Q.   If you can just confirm that that's a

9    copy of the Dahlia lease and that you signed it, that

10   would be great.

11        A.   Yes.

12        Q.   Okay.  And were there any promises or

13   representations made to you by anyone about that

14   document before you signed it?

15        A.   From anyone?

16        Q.   Yeah.  Before Greeley, you said, They

17   told me, Oh, you're signing this, but not really.

18   Were there any promises made to you by anyone before

19   you signed that document?

20        A.   No.

21        Q.   Okay.  And so you knew when you signed

22   that document you were signing as a tenant, correct?

23        A.   In February, the discussions about

24   Greeley and how that would -- Greeley was the model.

25   And so once Greeley closed with Mr. Gallagher

1    acquiring the property, Marquis being paid off,

2    Marquis pledging to loan money for the construction

3    effort, signing on a ground lease as, security

4    receiving the option to purchase the security, I don't

5    think we had any further discussion.  We just knew

6    each closing would have had those same documents.

7         Q.   Okay.  And you have nothing in writing

8    that says that either Mr. Gallagher or any of his

9    entities ever told you that you would not be

10   responsible for payments under that lease, correct?

11        A.   Not that I'm aware of.

12        Q.   And other than the conversation you had

13   prior to Greeley, Ms. Walker and Mr. Roberts never

14   told you, prior to signing the Dahlia lease, that you

15   would not be responsible for those payments, correct?

16             MR. VELARDE:  Objection to form.

17        A.   It was just the same deal, so we didn't

18   have to rehash the terms.

19        Q.   (BY MR. RAY)  Okay.  You need to answer

20   my question.  You had no conversations with either Dan

21   Roberts or Norma Walker after the Greeley transaction

22   about whether or not you would be responsible for

23   payments under the Dahlia lease, correct?

24        A.   That's correct.

25        Q.   Okay.  And you hadn't made any lease

DAVID HAMILTON

1   payments on the Dahlia lease, correct?

2         A.    No.  Just funding to MCW.  No.

3         Q.    You haven't made any payments to the

4   plaintiffs in this case on account of the Dahlia

5   lease, correct?

6         A.    Correct.

7         Q.    You received notices of default from us

8   back in November of '07.  Do you recall those?

9         A.    I believe so, yes.

10        Q.    Okay.  Let's talk about the option to

11  purchase on Dahlia.

12              (Deposition Exhibit 22 was marked.)

13              MR. VELARDE:  What number is this?

14              MR. RAY:  Sorry.  It is 22.

15              MR. VELARDE:  Thank you.

16        Q.    (BY MR. RAY)  Do you recognize and does

17  this look like a copy of the Dahlia option you

18  received?

19        A.    Yes.

20        Q.    When did you receive a copy of this?

21        A.    It would have been shortly after the

22  Dahlia closing, so early April of '07.

23        Q.    Why didn't you record it?

24        A.    I didn't have the original.

25        Q.    Did you ask someone to record it?

DAVID HAMILTON

71

1           A.    Yes.

2           Q.    Who?

3           A.    Norma Walker.

4           Q.    When?

5           A.    It would have been about the time that I

6    received a copy.

7           Q.    Okay.  So shortly after the closing, you

8    asked Norma Walker to record the option?

9           A.    Yes.

10          Q.    Via e-mail or over the phone?

11          A.    I believe it was e-mail.

12          Q.    And did she record it?

13          A.    She indicated that she would be

14   contacting either Mr. Gallagher or Ms. Cook and see if

15   we could get that recorded.

16          Q.    And so did you follow up with Ms. Walker?

17          A.    Yes.

18          Q.    And what was the status of that?

19          A.    She was still going to check on it.

20          Q.    And so a month after the closing, did you

21   follow up with Ms. Walker?

22          A.    It was some time after closing out.   I

23   don't remember specifically if it was a month.

24          Q.    When did it ultimately get recorded; do

25   you know?

1           A.    I believe it recorded at the same time in

2    late 2007 with the other four -- or the other three,

3    rather.

4           Q.    And the option period ends April 10,

5    2008, correct?  No.   2009.

6           A.    Yes.

7           Q.    And you didn't exercise the option,

8    correct?

9           A.    Correct.

10          Q.    And so what did Mr. Gallagher do to

11   deceive you about the option?

12          A.    On this particular option, nothing.

13          Q.    Okay.  How about the other options?  You

14   seem to be saying that there is some sort of deception

15   on another option or -- not this option?

16          A.    Well, on Lakewood.

17          Q.    Okay.  Let's talk about Lakewood.  What

18   did he deceive you about Lakewood?

19          A.    Well --

20          Q.    With the option.

21          A.    -- GGBC deeded the property to MCW

22   without contacting Marquis to discuss the option or

23   Marquis' perception of the transaction.

24          Q.    You couldn't even exercise the option at

25   that point, correct?

1          A.    Correct.

2          Q.    And so when this property sold to the

3    Culleys, you still had an option to purchase the

4    property, correct?

5          A.    That's more of a legal question, but I

6    don't think so.

7          Q.    Why not?  I don't mean to get into legal

8    stuff, but --

9          A.    Because the Culleys had not granted an

10   option to purchase and GGBC was no longer the owner.

11         Q.    You're familiar with real estate.  If you

12   grant me an option on your personal home to buy --

13   okay -- for the next two years, I have an option to

14   buy.  And you go to sell that property, your home, to

15   your attorney, what's your understanding of what my

16   rights are as the holder of the option?  Can I still

17   buy it from Sean?  And this has nothing to do with

18   legal. Just your understanding.  You signed 12

19   options.  What did you think it meant?

20              MR. VELARDE:  I'm objecting to form.

21         A.    Based on my experience, I would have

22   contacted you, and you would either have an option to

23   step up and acquire it now, you could terminate your

24   option or you could tell me, Dave, you better hold

25   that property for me, not sell it to Sean, and we

DAVID HAMILTON

74

1    would go that route.

2           Q.   (BY MR. RAY)   Okay.   And so when you have

3    an option, Marquis has an option on the Lakewood

4    property, what was your understanding of when you

5    could exercise that option?   I can give you the

6    option.

7           A.   I believe it was tied to about a year

8    after GGBC's acquisition, so April '07 -- probably

9    April '08 would be the start.

10          Q.   And did you exercise that option?

11          A.   After April '08?

12          Q.   Yeah.

13          A.   No.

14          Q.   Why not?

15          A.   Because the property was no longer owned

16   by GGBC.

17          Q.   But you had an option to purchase that

18   was recorded.   I'm just wondering why you didn't

19   exercise that option.

20          A.   At that point in time, Marquis had a note

21   and deed of trust from the Culleys.   We did

22   subsequently obtain an option to purchase directly

23   with the Culleys.

24          Q.   So now you have an option to purchase.

25   So what's the problem with this option if you've got

1   an option to purchase now?

2        A.   Well, the option to purchase came from

3   the Culleys in March of 2009.

4        Q.   Okay.  Your testimony here under oath is

5   that you were unaware of the fact that GGBC was going

6   to sell the Alameda property to MCW and the Culleys?

7             MR. VELARDE:  Objection to form.

8        A.   No.

9        Q.   (BY MR. RAY)  Okay.  You just got done

10  testifying that you thought the deception by

11  Mr. Gallagher was that he sold this property, without

12  contacting you and without informing you, to MCW and

13  the Culleys, when the e-mails I saw during that

14  Quinlan trial had your name all over them.  So

15  reconcile those two statements for me.

16       A.   Well, I was aware that ultimately GGBC

17  was going to sell it to MCW, but in the last two or

18  three days of the transaction, there were a number of

19  different terms and financing schemes and, No, we're

20  not going to finance and, you know, We're going to

21  take a deed of trust; just a lot of moving parts.  And

22  I felt that I should have been privy to that -- those

23  negotiations by the fact that Marquis had a lease, had

24  a right to buy the property.

25       Q.   You got done testifying that the

DAVID HAMILTON

1    deception by Mr. Gallagher -- and you can rephrase or

2    add more deceptions, whatever you want to testify

3    to -- was that he didn't inform you that he was

4    selling the property to MCW when you had an option.

5    Do you remember testifying to that?  That was the

6    deception.

7              A.    Yes.  I did not hear from Mr. Gallagher.

8              Q.    Okay.  You heard from Norma Walker that

9    the property was being sold, correct?

10             A.    Yes.

11             Q.    You heard from Lance Vanzant the property

12   was being sold, correct?  I've seen your e-mails

13   direct to Lance with a cc all over it about the

14   carryback.

15             A.    With Lance Vanzant?

16             Q.    Yeah.

17             A.    I believe I was subsequently copied on

18   e-mails that he and Norma Walker exchanged, but I

19   don't recall any direct communications with

20   Mr. Vanzant about the deal points.

21             Q.    Okay.  And you were certainly told by Dan

22   Roberts about this closing, right?

23             A.    Right.

24             Q.    So you were told by at least two people,

25   including your borrowers, that this property was going

1    to sell, and you're objecting that you didn't hear

2    that directly from Mr. Gallagher; is that correct?

3           A.    I didn't hear the -- and was not allowed

4    to be involved in the negotiations, and maybe I would

5    have agreed, maybe I wouldn't have.

6           Q.    You're kidding, right?  You weren't part

7    of the negotiations, right?  That's your testimony?

8           A.    Yes.

9           Q.    Explain to me how the very day of the

10   closing, if you had nothing to do with this -- how

11   would MCW gratuitously assign to you a $1.9 million

12   deed of trust if Marquis had nothing to do with it?

13              MR. VELARDE:  Objection to form.

14          A.    Are we talking about a conversation I had

15   with Norma Walker and Mr. Roberts, or are we talking

16   about the conversation that I should have had but did

17   not have --

18          Q.    (BY MR. RAY)  What I'm trying to get

19   at --

20          A.    -- with GGBC?

21          Q.    -- Mr. Hamilton, is that you're

22   suggesting that nobody apprised you of the fact that I

23   had this option and -- Mr. Gallagher is going to sell

24   the property to MCW while I have this option in place,

25   yet Ms. Walker told you about this, Mr. Roberts told

DAVID HAMILTON

78

1    you about this and, in fact, you encouraged this,

2    because you received a $1.9 million secured deed of

3    trust out of the deal, correct?  You approved the

4    Culley transaction, correct?

5              MR. VELARDE:  Objection to form.

6         A.   I approved of it, but my understanding

7    was different.  I also was led to believe that there

8    was a $1.3 million loan happening concurrently --

9         Q.   (BY MR. RAY)  That's true.

10        A.   -- and that was pulled off the table at

11   the last minute.

12        Q.   That was all MCW, right, and the Culleys?

13        A.   No.  That was the e-mail you referred to

14   that Lance Vanzant and Norma Walker subsequently

15   copied to me.

16        Q.   Sure.  Sure.  And what I'm trying to get

17   at is you're saying that there was some sort of

18   problem with the fact that you had this option, and

19   now the property is being sold from underneath you

20   when -- when it's being sold, you're now a secured

21   lender.  How are you getting a deed of trust and being

22   a secured lender and not having anything to do with

23   this transaction and not being aware of the fact that

24   this is going on?  How is that possible?

25        A.   This option document goes to the real

DAVID HAMILTON

79

1    property and Marquis' ability to acquire the real

2    property --

3            Q.    Sure.

4            A.    -- sometime after April of '08.  The deed

5    of trust you are referring to was for the money that

6    Marquis lent to MCW for the construction.

7            Q.    That was unsecured before the Culley

8    closing.

9            A.    No.  It was secured by the lease

10   agreement.

11           Q.    You had no deed of trust on that

12   property, correct?

13           A.    Not at the time.

14           Q.    And if GGBC had sold the property to

15   whoever it wanted to, you had no security in that

16   property except for your option?

17           A.    That's not true.

18           Q.    Okay.  Explain to me.

19           A.    My understanding is, if GGBC would have

20   sold to a third party, they would have had to honor

21   the lease.

22           Q.    What other problems do you have with the

23   options?  I understand your issue on the Lakewood,

24   that Mr. Gallagher didn't apprise you of the fact that

25   you're going to get a $1.9 million deed of trust.

DAVID HAMILTON

1    Anything else?  Any other options?

2         A.    I was actually supposed to get the lion's

3    share of the $1.3 million loan that was happening

4    concurrent.

5         Q.    What was happening?

6         A.    I wasn't just supposed to get a $1.9

7    million deed of trust.

8         Q.    From who?  Who promised you that?

9         A.    The loan that Mr. Gallagher was -- or one

10   of his entities was making relating to the Culley

11   closing.

12        Q.    When did he ever agree to that?  We went

13   through a whole trial for weeks, and the Court said no

14   agreement, because there wasn't any e-mail that Steve

15   ever signed.

16        A.    I know.  That e-mail didn't surface in

17   the Quinlan case.

18        Q.    Real quick.  You got an e-mail that

19   suggests that Mr. Gallagher agreed to this

20   $1.3 million carryback, or his attorney agreed to it?

21        A.    Yes.

22        Q.    And you didn't produce that in connection

23   with the Quinlan case?

24             MR. RAY:  I'm not being difficult here,

25   Sean.

1          A.    It came out of hours and hours of looking

2     through MCW's e-mails.

3          Q.    (BY MR. RAY)  When did you find this?

4          A.    I don't know.  I produced it to Jamie.  I

5     think it was either subsequent to trial or after

6     disclosure had been cut off or something.

7          Q.    Why didn't you tell the Court about this?

8     This is very important.  When you find evidence -- we

9     went through an entire trial, and you knew throughout

10    that entire trial the issue was whether Mr. Gallagher

11    agreed to that $1.3 million carryback.  You find

12    evidence after the fact that contradicts even your own

13    testimony in court where you said, no, he never agreed

14    to this, and you didn't tell anybody about that?

15         A.    Well, it's the same information that all

16    the parties involved in the Quinlan case had in your

17    files, and I just happened to read that one of the

18    thousands --

19         Q.    Okay.  Well, safe to say, Mr. Gallagher

20    and the e-mail that did go in that trial was from

21    Lance Vanzant that said, Steve is not agreeing to the

22    1.3 million.  So my question is:  What other issues do

23    you have with the options to purchase?  You mentioned

24    Lakewood.

25         A.    No other issues.

DAVID HAMILTON

82

1          Q.     No other issues?

2          A.     You mean -- are we moving on?

3          Q.     I'm tying to close the loop on the

4     options.

5          A.     The other two remaining options, I would

6     say, go in the same line as Greeley.

7          Q.     Straightforward?

8          A.     Straightforward.  They were part of the

9     security instrument.  They were tied to the lease

10    agreement, and they were not exercised.

11         Q.     And Mr. Gallagher never failed, as we

12    talked about, or refused, more specifically, to record

13    any of those options.  I know we talked about Greeley.

14    I just want to make sure on the other ones.

15         A.     The same information, because when the

16    discussion about the Greeley option took place, it was

17    not focused on Greeley.  It was focused on the

18    options, so it encompassed all four.

19         Q.     So Mr. Gallagher never refused to record

20    any of the options, correct?

21         A.     Not in words.

22         Q.     Well, did he do sign language?

23         A.     Well, the evidence is that the options

24    were not recorded.

25         Q.     Say that again.

1          A.    There was nothing on record that the

2     options had ever been recorded, so . . .

3          Q.    Okay.  So when did he refuse and tell

4     you, I'm not recording these?

5          A.    The request in April was that these be

6     recorded, and they were never recorded.

7          Q.    You didn't make that request to

8     Mr. Gallagher.

9          A.    I made it to Mr. Gallagher through Norma

10    Walker.

11         Q.    You keep saying that.  I'm being very,

12    very clear.  You keep saying "through."  You did not

13    make that request to Mr. Gallagher, correct, directly?

14         A.    Correct.

15         Q.    So no other issues with the options other

16    than what we've talked about.  All right.

17              (Deposition Exhibit 12 was marked.)

18         Q.    I'm going to try to do this one quick,

19    too.  Exhibit 12, this is the Loveland lease.  Just

20    look at it.  Is it a copy?  Is that your signature?

21         A.    Yes.

22         Q.    And you just testified with the Lakewood

23    one that there were no promises or representations

24    made prior to you signing this, other than what

25    occurred prior to signing the Greeley lease, correct?

```
1            A.   Correct.

2            Q.   Okay.  And you haven't paid any rent on

3   account of the loan lease, correct?

4            A.   Correct.

5            Q.   Are there any other reasons why you think

6   you are not responsible for paying the leases, other

7   than what we have talked about here today, the

8   security debt issue?

9            A.   No.

10           Q.   Okay.  You received an option on

11  Garfield, or Loveland, correct?

12           A.   Yes.

13           Q.   No issues with that?

14           A.   No.

15           Q.   On Dahlia, that was sold approximately in

16  April of '07 or --

17           A.   April 9.

18           Q.   And you had testified that construction

19  was already under way at the time that property was

20  sold to GGBC II?

21           A.   Yes.

22           Q.   Had you visited the job site?

23           A.   No.

24           Q.   Had you seen pictures?

25           A.   Yes.
```

```
 1              Q.    Had you received correspondence from Dan

 2    Roberts suggesting the progress of Dahlia?

 3              A.    Yes.

 4              Q.    So you knew contractors were actively

 5    working at the project?

 6              A.    Yes.

 7              Q.    Who was paying those contractors?

 8              A.    MCW.

 9              Q.    Through what means?

10              A.    Marquis' construction loan.

11              Q.    Okay.  So Marquis' loan.  Was that at

12    Vectra?

13              A.    Yes.

14              Q.    So you had a Dahlia Vectra account as

15    well.

16              A.    One account.

17              Q.    I'm sorry?

18              A.    There was just one account.

19              Q.    Okay.  And Alameda and Dahlia came out of

20    the one account?

21              A.    Yes.

22              Q.    Did you pay all the contractor bills that

23    were submitted to you for payment?

24              A.    Yes.

25              Q.    At the time, in April 2007, did you
```

DAVID HAMILTON

1    believe there were any unpaid contractors?

2         A.    No.

3         Q.    Had you received any statements of liens

4    from contractors at that time?

5         A.    No.

6         Q.    Had you received any e-mails from Dan

7    Roberts stating that he was falling behind on bills?

8         A.    No.

9         Q.    When was the first time you learned that

10   contractors weren't getting paid at Dahlia?

11        A.    Probably August of 2007.

12        Q.    How did you learn that?

13        A.    Each time contractors were paid, Marquis

14   received a draw request and authorized Vectra Bank to

15   pay those particular bills, and I know that Marquis'

16   last payout was July 25 of 2007.

17        Q.    On Dahlia?

18        A.    On Dahlia.

19        Q.    Why was that the last payment?

20        A.    Because shortly after that, the money

21   that was promised to come out of the Lakewood closing

22   came out in the form of a note, so at that point in

23   time, MCW had depleted their construction fund

24   account.

25        Q.    In April, what was the balance of that

DAVID HAMILTON
87

1    account?  Was it starting to be depleted at that

2    point?  Did you have concerns then?

3          A.    Well, in April it had several hundred

4    thousand dollars, and then after the three closings in

5    April, all of Marquis' notes and deeds of trusts were

6    paid off, so April was probably the healthiest month,

7    cash flowwise.  It probably had, you know, a million

8    and a half to $2 million in the account.

9          Q.    Why didn't you tell GGBC II, the

10   landlord, that We're out of money.  No more funds in

11   the construction fund.  All these contractors are

12   going to still be working.  You're on your own?

13         A.    I believe Dan Roberts sent an e-mail to

14   Mr. Gallagher, copied to me, explaining that the next

15   source of funds would be coming from the Lakewood

16   closing.  We were in August of '07, and we all know

17   that Lakewood closed at the end of August into early

18   September, so Mr. Roberts conveyed that money would be

19   available to continue Dahlia and Santa Fe.

20         Q.    I don't get it.  In April, three

21   properties just closed.  You get probably well over a

22   million dollars from Mr. Gallagher's entities that go

23   into the deal.  Where did all of that money go?

24         A.    It went to Lakewood.  It went to Dahlia.

25         Q.    It went to Lakewood.  Okay.  And so it

1    went back into Dahlia?

2           A.    Money -- as I testified earlier, there

3    was about $420,000 funded to Dahlia and roughly a

4    million-nine or a little over a million-nine to

5    Lakewood, so you're a little over 2.3 million at that

6    point, and I believe MCW funded some engineering fees

7    and things for other projects.

8           Q.    Did you know that when you signed the

9    lease that you agreed to pay any mechanic liens that

10   were incurred while you were in possession of the

11   property?

12              MR. VELARDE:   Objection to form.

13          A.    I knew that MCW was responsible.

14          Q.    (BY MR. RAY)  Well, it says "tenant," and

15   you were a tenant, right?

16          A.    Right.

17          Q.    So is it just the same argument you were

18   making before?  Is there anything different than --

19          A.    No.

20          Q.    Okay.  A few more and we'll wrap up for

21   lunch, and it looks like we'll get out of here a

22   little early this afternoon.

23              Let's talk about the property exchange,

24   Winter Park.

25          A.    Okay.

1          Q.   Who's Joseph Kilpatrick?

2          A.   He's a high school friend, was a business

3     associate for a time until he relocated to Reno,

4     Nevada, specifically Fernley.

5          Q.   Why would he have been making contracts

6     with Mr. Gallagher to acquire the Winter Park

7     property?

8          A.   I told him about the Winter Park

9     property, and he and I had some interest in finding

10    out if it was available.

11         Q.   So why didn't you tell Mr. Gallagher that

12    you were behind the scene in that deal?

13         A.   Well, for one reason, we were entangled

14    in litigation, and I was not supposed to contact

15    Mr. Gallagher.  Another is we weren't sure --

16         Q.   So you wanted to hide it from

17    Mr. Gallagher because you were in litigation?

18              MR. VELARDE:  Objection to form.

19         A.   No, that's not what I said.  I was

20    instructed to not make contact directly with

21    Mr. Gallagher while in litigation.

22         Q.   (BY MR. RAY)  Okay.  The next reason?

23         A.   I contacted a Winter Park realtor and

24    told her that we had some interest in the property,

25    wanted to know if it was for sale.  She said, Nothing

 1    listed, and she took it upon herself to contact

 2    someone, whether it be Mr. Gallagher or Ms. Cook.  I

 3    don't know who she contacted.

 4          Q.    So this was before the exchange of the

 5    property, correct?

 6          A.    No.

 7          Q.    After?

 8          A.    Yes.

 9          Q.    Okay.  Well, how would it be after if

10    Mr. Gallagher sold the Winter Park property to

11    Mountain Lion and Carter Court and then Kilpatrick is

12    making contact with Gallagher for the Winter Park

13    property?  Wouldn't it have been before the exchange?

14          A.    No.

15          Q.    Okay.  Help me out.

16          A.    Winter Park sold the property to MCW and

17    affected the exchange with Eisenhower and Carter

18    Court.  And in subsequent months, Emerald Isle, the

19    lender on the Winter Park property, foreclosed, became

20    the owner.  And so the Kilpatrick negotiations in the

21    summer of '08, roughly, was with Emerald Isle.

22          Q.    Okay.  Why did you guys not go through

23    with the deal?

24          A.    There was a discrepancy in appraisals,

25    and it was just difficult to put our finger on what a

DAVID HAMILTON

1    real value was.

2            Q.    What would have been your source of funds

3    to acquire that Winter Park property, since we've got

4    all this money floating around from car wash to car

5    wash?

6            A.    Mr. Kilpatrick and I would have applied

7    for an acquisition loan.

8                  (Deposition Exhibit 34 was marked.)

9            Q.    I'm handing you Exhibit 34.  Do you see

10   that?

11           A.    Yes.

12           Q.    Do you recognize it?

13           A.    I do.

14           Q.    Is that your signature at the bottom?

15           A.    Yes.

16           Q.    Do you know what it means when you sign a

17   promissory note?

18           A.    Yes.

19           Q.    What does it mean?

20           A.    It's a promise to pay an obligation.

21           Q.    Okay.  And what was your obligation in

22   this instrument, as you understood it when you signed

23   it?

24           A.    Well, I understood that this note was

25   being created.  I don't really have a full

DAVID HAMILTON

```
 1    understanding of how their exchange went through, but
 2    somehow they had to show equal value for the Winter
 3    Park property as it related Eisenhower and Carter
 4    Court.  Both properties had to come up with about a
 5    million-eight, and then Mr. Gallagher was doing some
 6    sort of financing through one of his entities for a
 7    short period of time until he could get financing over
 8    on Eisenhower and Carter Court.
 9         Q.   Okay.
10         A.   So this was just going to be kind of a
11    bridge loan is what I understood until appraisals and
12    new financing could be had on Eisenhower and Carter
13    Court.
14         Q.   Because this was only just over a year
15    loan, right?
16         A.   Well, it was written for one year.
17         Q.   Right.  And why didn't you pay the money
18    back?
19         A.   I didn't receive any money.
20         Q.   Well, you said you know what a promissory
21    note is.  A promise to pay, right?
22         A.   It's a promise to pay on what you have
23    received.
24         Q.   Oh, that's your testimony?  You never
25    signed a guarantee before in your 20-plus years of
```

1    real estate background?

2            A.    On a couple of occasions, I signed on

3    behalf of Marquis.

4            Q.    How about just a guarantee -- do you have

5    any kids?

6            A.    No.  Well, yes, I have kids.

7            Q.    I didn't know whether you have any kids

8    was a confusing question.

9            A.    You asked two questions.

10           Q.    Do you have any kids?

11           A.    Have I ever signed a guarantee and do I

12    have kids.

13           Q.    Fair enough.

14           A.    So yes.  No.  Ask the question and I'll

15    answer, and then we will move to the next question.

16           Q.    Sounds like a great plan.

17                 Do you have kids?

18           A.    Yes.

19           Q.    Have you ever signed as a guarantor for

20    one of your kids' loans?

21           A.    No.

22           Q.    Have you ever signed a guarantee -- a

23    personal guarantee for Marquis to take a loan?

24           A.    Yes.

25           Q.    And in those cases, David Hamilton,

DAVID HAMILTON

94

1    individually, didn't receive any money, correct?  It

2    was Marquis.

3          A.   Yes.

4          Q.   So you understand that you can receive

5    money out of a transaction, agree to repay that money

6    and never see a dime of it.  You obviously understand

7    that.  You've done that before.

8          A.   I've signed those agreements, but I've

9    never been put in a position to have to pay as a

10   guarantor.

11         Q.   But when you signed that agreement, the

12   previous loan, you knew if it didn't get paid, that

13   even though you didn't receive any money individually

14   out of it, that you would still have to pay it, right?

15   You knew that.

16         A.   Yes.  I suppose so, yes.

17         Q.   Okay.  So why did you think it was

18   something different?  Just because you didn't get

19   money in this case, why did you think it was different

20   when it says you promise to pay?  Why is it different

21   than the other guarantees you said you're familiar

22   with?

23         A.   Well, the difference in this one was that

24   this was supposed to, as I said earlier, be a bridge

25   loan, because it involved some collateral that Marquis

DAVID HAMILTON

95

1    had in its control.  It was on the document.  So I
2    believed that this would go away when they effectively
3    completed their exchange.
4            Q.   Where does it say that on the document?
5            A.   The promissory note doesn't describe
6    that.
7            Q.   And I haven't see any e-mails to that
8    effect.
9                 MR. VELARDE:  Objection to form.
10           A.    I believe I have -- it may be in the 1500
11   pages that we sent to you.
12           Q.   (BY MR. RAY)  Well, you amended your
13   discovery responses recently.  You're aware of that,
14   correct?
15           A.   Yes.
16           Q.   You changed one of your requests for
17   admission -- which never happens, but it happened --
18   and you admitted that you have no communication,
19   written or otherwise, that show that Steve Gallagher
20   ever agreed to release you from liability under this
21   note.  You stand by that?  You've got no e-mails?
22           A.   Yes.
23           Q.   Okay.  So we're on the same page that
24   Mr. Gallagher, none of his entities or any of his
25   employees, ever told you that you would be released

DAVID HAMILTON

1    from liability under Exhibit 34?

2             A.    That's correct.

3             Q.    I've got -- well, I'll just mark it.

4                   (Deposition Exhibit 41 was marked.)

5             Q.    This is Exhibit 41.  Page 27.  I'll

6    represent to you this is the counterclaim answer.

7             A.    I was trying to find that.  Okay.

8             Q.    You just got done testifying that

9    Mr. Gallagher and none of his entities ever promised

10   you that they would release you from liability under

11   the note.  The last sentence of paragraph 176, you're

12   telling the Court, "Mr. Gallagher would then release

13   Marquis and the Dahlia Property improvements after

14   obtaining the finance."  Do you see that?

15            A.    Yes.

16            Q.    You just testified he never told you

17   that.

18            A.    Well, again, communication came from

19   Ms. Walker and --

20            Q.    Hold on a second.  Where does it say that

21   in 176?

22            A.    You're asking how I formed this opinion,

23   I thought.

24            Q.    You're making statements to the Court

25   Mr. Gallagher is going to do something, so what's the

1    basis of that opinion?

2          A.    I didn't say that he said that.  I said

3    he would.

4          Q.    Where did you get that understanding

5    from?

6          A.    Well, there was initial communication

7    going into this deal with Dan and Norma.  Subsequent

8    to it, I asked -- via e-mail, I asked Norma if Steve

9    was -- how his loan was going on the Eisenhower and

10   Carter Court properties.  He would be coming off of

11   Dahlia soon, can we wrap this up?  And she said she

12   would talk to him.

13          And then subsequent to that, I have an

14   e-mail, I think, that was authorized by

15   Mr. Gallagher that acknowledges that they did meet,

16   apparently, at his attorney's office.  He, Dan

17   Roberts, and Ms. Walker had had discussions about

18   that.

19          Q.    About what?

20          A.    About the Dahlia release, you know.

21          Q.    They had discussions.  Nothing came of

22   that.  No one ever agreed to release you.  You just

23   got done testifying to that.  Are you suggesting that

24   that's different, that during that meeting --

25          A.    Well, I'm suggesting that the totality of

1   those communications led me to believe that he would

2   release.

3            Q.   After that meeting, did Ms. Walker or Dan

4   Roberts tell you that Mr. Gallagher would release you

5   from liability under the note?

6            A.   No.

7            Q.   Okay.  So nobody from Mr. Gallagher's

8   side, not Mr. Roberts, not Ms. Walker told you that

9   Mr. Gallagher would release you from liability under

10   the note, correct?

11           A.   At that point in time, they didn't

12   believe he would.

13           Q.   Okay.  So why are you telling the Court

14   that he will?  "Mr. Gallagher would then release

15   Marquis and the Dahlia Property."  It was your

16   testimony that no one told you that Mr. Gallagher

17   would do that.

18                MR. VELARDE:  Objection to form.

19           A.   That was my understanding going into the

20   deal is that's what would happen.  That's it.

21           Q.   (BY MR. RAY)  But what's your

22   understanding based on if no one told you that?  You

23   have to base your understanding on something.  If no

24   one is telling you and nowhere in the document says

25   you are going to be released, you admitted that you

1    have no writing or communication that says you're

2    going to be released and you said everyone in the deal

3    didn't tell you that, where did you get this -- strike

4    that.  Where did you get this idea?

5           A.   That kind of misstates what I said.

6    Maybe I didn't say it clear enough.  Going into the

7    deal, there were e-mail communications.  Subsequent to

8    the deal, it was first represented it would take about

9    90 days to acquire this new financing on Eisenhower

10   and Carter Court.

11          Q.   By who?  Who represented that to you?

12          A.   Ms. Walker represented that Mr. Gallagher

13   was seeking financing, bank financing on those two

14   properties.

15          Q.   So, again, Ms. Walker told you this.  Go

16   ahead.

17          A.   And so after about 90 days, I e-mailed to

18   her saying, Give me an update.  What's the progress

19   being made, something to that effect, and reminded her

20   that Marquis was supposed to be released out of this

21   when the new financing was getting procured.  And

22   that's when she said that they had a meeting set up

23   with Mr. Gallagher.

24          Q.   And the results of that meeting were that

25   they would not release you, correct?

1          A.    No, not exactly.  And this is from an

2    e-mail.  It was, Mr. Gallagher, I don't really

3    remember.  That must have been something you discussed

4    with Mr. Vanzant and you need to follow up with him.

5          Q.    Did Mr. Vanzant ever tell you that you

6    would be released from liability under the note?

7          A.    No.

8          Q.    So Lance didn't tell you that.  Steve

9    didn't tell you that.  Did Holly Cook tell you that?

10         A.    No.

11         Q.    Norma Walker tells you they're having a

12   meeting and will discuss it.  Did she ever tell you

13   after that meeting that, Guess what?  You're off the

14   hook?

15         A.    No.  Prior to that meeting, she had

16   represented that he would release Dahlia, he would

17   release Marquis.  It was after a heated meeting that

18   they came back and said, We don't think he is going to

19   do anything.  Litigation had already been initiated.

20         Q.    I just got done -- we can read back the

21   record.  I asked you if Norma Walker told you you

22   would be released, and your testimony was, No, that

23   they discussed it and they were going to discuss it,

24   but that she never promised that to you.

25         A.    And I thought you were talking about what

1    came out of the meeting, so that's what I was saying

2    to you is coming out of the meeting, the deal changed.

3    She said, I don't think he's going to honor the

4    previous arrangement, and so --

5            Q.   When was this previous arrangement made?

6            A.   Well, at the time that the Winter Park

7    exchange -- if you want to call it that -- when that

8    happened, that's what led me to sign on a note.  They

9    needed additional collateral.  We first talked about

10   Lakewood being that collateral, but Lakewood was

11   literally 30 days away from closing, so it went away

12   from Lakewood to Dahlia being that additional

13   security.

14           Q.   So you're saying at the time this was

15   signed, there was a deal -- the 60- to 90-day deal.

16   Who told you that?

17           A.   That came from Norma Walker.

18           Q.   Not from Steve Gallagher?

19           A.   No.

20           Q.   Not from his attorney, correct?

21           A.   Correct.

22           Q.   Where is Norma Walker on this note

23   anywhere?  Is she a party to this note?

24           A.   Well, to the extent that she had interest

25   in MCW, I would say she may be.

DAVID HAMILTON

1           Q.    She is not a part of Marquis, correct?

2           A.    She is not part of Marquis.

3           Q.    She is not a part of Emerald Isle,

4    correct?

5           A.    No.

6           Q.    Okay.  So why would you be taking

7    comments about a note that's owed by Emerald Isle from

8    someone that you just testified is not affiliated with

9    Emerald Isle?

10          A.    I don't think Emerald Isle owed this

11   note.  Is that what you said they were?  They were not

12   the maker.

13          Q.    You're telling me that you based your

14   opinion that you would be released from this note,

15   from what I'm hearing, only on one thing -- and please

16   correct me, because this is very important -- from

17   what Ms. Walker told you.  There is no writing.

18   You've admitted that in your requests for admission.

19   So she told you that you would be released from

20   liability, correct or incorrect?

21          A.    And I believe there were e-mails to that

22   effect, too.

23          Q.    Well, then, why do you say in your

24   requests for admission -- this is so frustrating as a

25   lawyer.  We try to get consistency.  And you say --

1    "Please admit that you have no documents or other

2    writing evidencing Mr. Gallagher or Emerald Isle's

3    purported promise to release you from liability under

4    the July Emerald note as you referenced.  Admitted."

5    You don't have any documents.

6         A.    To me, if I take exactly what that says,

7    I do not have a document between Mr. Gallagher and his

8    entities and Marquis.  Third parties --

9         Q.    Why would you take what a third party

10   tells you as words from someone else?

11        A.    Because this particular third party, I

12   had seen multiple e-mails where she is having meetings

13   with Mr. Gallagher's attorney, they're discussing deal

14   points.  The attorney is providing her with documents

15   to refine into final agreement form that ultimately

16   were signed by Mr. Gallagher or his entities.  Similar

17   e-mails between her and Mr. Gallagher.

18              So, you know, looking back, those

19   communications came to me, and the end result was that

20   that information held true.  That's how the deal went

21   together.  I didn't have any reason to, you know,

22   several months into this relationship --

23        Q.    Sure you did.  Steve Gallagher wasn't

24   even part of the deal when you first met MCW and Norma

25   Walker, correct?

```
 1                    MR. VELARDE:  Objection to form.

 2          A.    What I'm speaking to is from --

 3          Q.    (BY MR. RAY)  Let's just slow down here.

 4   You didn't know who Steve Gallagher was when you met

 5   Norma Walker and Dan Roberts, correct?

 6          A.    Correct.

 7          Q.    Your entire dealings with MCW for the

 8   first four months were with Dan Roberts and Norma

 9   Walker, correct?

10          A.    Correct.

11          Q.    Okay.  You heard Norma Walker testify in

12   court during the temporary preliminary injunction

13   hearing, she has never signed a document on behalf of

14   Steve or any of his entities.  Do you recall that

15   testimony?

16                    MR. VELARDE:  Objection to form.

17          A.    Yes.

18          Q.    (BY MR. RAY)  Do you have any reason to

19   doubt that testimony?

20          A.    No.

21          Q.    Okay.  You haven't seen a document that

22   she signed, correct?

23          A.    That's correct.

24          Q.    You've heard her testify that she has

25   never had authority to make any decisions on behalf of
```

1     Emerald Isle or any of their entities, correct?

2          A.   True.

3          Q.   Do you have any reason to disprove or

4     doubt that?

5          A.   No.

6          Q.   Okay.  And GGBC was buying these

7     properties from MCW, right?  MCW and GGBC were two of

8     the parties to the transaction, right?

9          A.   What transaction?

10         Q.   The entire transaction.  You're

11    suggesting that, Well, Norma Walker and GGBC traded

12    information and, you know, communicated and exchanged

13    information.  Well, they were buyers and sellers of

14    property.  Isn't that what normally happens when you

15    close a deal; buyers give information to sellers and

16    sellers respond via e-mail?  I sent information over.

17    You get it back.  I mean, isn't that how it goes?

18              MR. VELARDE:  Objection to form.

19         A.   First of all, GGBC wasn't formed until

20    April 6 of 2007.  The negotiations between the parties

21    on other deals came much earlier than that.  You're

22    talking about --

23         Q.   (BY MR. RAY)  In general.

24         A.   The consistency of Norma Walker being

25    either in front of Mr. Vanzant, working together

1    creating documents, whether they did it at their home

2    offices, not specific to GGBC, but all of

3    Mr. Gallagher's entities that I was loosely involved

4    with, the information was passed through Norma Walker.

5    Not only coming to me, but back to the other side from

6    me.  And so we had closed -- collectively we had

7    closed on four properties before we got to the Winter

8    Park exchange and --

9          Q.   Let's make this real easy.  Let's make

10   this real easy.  We just got hammered at the Quinlan

11   trial, and one of the findings at the Quinlan trial --

12   and this is very relevant in this case -- was that

13   we're involved in a joint venture, meaning Marquis --

14   actually, Marquis, David Hamilton, Steve Gallagher,

15   GGBC, MCW and Dan Roberts.  Do you remember that crazy

16   finding?

17         A.   I do.

18         Q.   Do you disagree with that finding as

19   adamantly as we do over here?

20         A.   Absolutely.

21         Q.   Okay.  So sitting here today as president

22   for Marquis, you agree -- or you disagree that MCW,

23   GGBC and Marquis are part of a joint venture?

24         A.   Correct.

25         Q.   Okay.  You agree that each of those

DAVID HAMILTON

107

1    entities is a separate and distinct corporation,

2    correct?

3          A.   Correct.

4          Q.   You agree that you're the one that runs

5    Marquis, correct?

6          A.   Correct.

7          Q.   You agree that Dan Roberts is the one

8    that runs MCW, correct, or Norma Walker?  Who knows

9    who runs that family.

10         A.   I believe Dan runs MCW.  I'm not sure who

11   runs Dan, but yes.

12         Q.   And you know that Mr. Gallagher or his

13   partner runs GGBC?

14         A.   Correct.

15         Q.   Okay.  And you can't call the shots for

16   GGBC, can you?

17         A.   No.

18         Q.   And Mr. Gallagher can't call the shots

19   for Marquis?

20         A.   Correct.

21         Q.   And Mr. Gallagher can't call the shots

22   for MCW?

23         A.   Correct.

24         Q.   And Dan Roberts can't call the shots for

25   GGBC?

DAVID HAMILTON

```
 1         A.    Correct.

 2         Q.    Quinlan tried to say that Norma Walker

 3   was everybody's agent.  Do you remember that?  Norma

 4   is acting on behalf of everybody, sending e-mails for

 5   Marquis and Steve.  Was Norma Walker your agent?

 6         A.    No.

 7         Q.    Was Norma Walker -- did you see any

 8   evidence that Norma Walker was GGBC's or Steve

 9   Gallagher's agent?

10               MR. VELARDE:  Objection to form.

11         A.    No.

12         Q.    (BY MR. RAY)  Okay.  And the same

13   question for Dan Roberts.  Was Dan Roberts your agent?

14         A.    No.

15         Q.    Did you see any evidence or do you have

16   any evidence that Dan Roberts was Steve Gallagher's or

17   his entities' agent?

18         A.    No.

19         Q.    Now, if Norma Walker had told Quinlan

20   before the closing, Guess what?  Marquis is agreeing

21   to pay you in full.  You're going to get taken care.

22   Marquis is going to do it, Mr. Hamilton.  Quinlan

23   comes to you after the fact and says, Ms. Walker just

24   said that you're going to pay.  Would you be bound, in

25   your opinion, by what Ms. Walker said you would do?
```

1          MR. VELARDE:  Objection to form.

2     A.   Given that scenario, I would say no.

3     Q.   (BY MR. RAY)  Okay.  She doesn't have

4 authority for you, right?

5     A.   Correct.

6     Q.   Okay.  Why do you think Ms. Walker, who

7 is not a party to Exhibit 34, would have any say in

8 any of the terms to this agreement if she had nothing

9 to do with this?

10     A.   Well, I think you have to look beyond

11 just what she says to what's attached to what she is

12 saying.

13     Q.   Okay.  Break that down.

14     A.   When information comes to me via e-mail

15 from Norma Walker and it has attachments from Lance

16 Vanzant, who I know to be Mr. Gallagher or his

17 entities' attorney, and it's saying Marquis needs to

18 do this particular item or -- based on the Culley

19 closing, for example -- we need to make Vanzant's

20 e-mail -- we need to make sure that the transaction

21 goes from Culleys -- the transfer goes from Culley to

22 Marquis, then to Steve so that there is no problem

23 with the note, that type of thing.

24          So that's just an example of information

25 coming from Norma Walker, but being corroborated by

DAVID HAMILTON

1   attached e-mails by Mr. Gallagher or his entities'

2   attorney.  So I give it a little more weight than just

3   your scenario of Quinlan and Marquis and Norma Walker.

4          Q.   Well, you have no e-mail or other

5   attachments that even alludes to what you're

6   suggesting about the 60- to 90-day promise to release,

7   right?

8          A.   I do, but as we clarified and I answered

9   what I believed to be the question, and that was did I

10  have communications between Mr. Gallagher or his

11  entities and myself, and what I'm saying to you today

12  is I did receive and have some dialogue with

13  Ms. Walker regarding that 60- to 90-day window.

14         Q.   Okay.  And you just stated on the record

15  that Ms. Walker was not the agent of Mr. Gallagher or

16  his entities, correct?

17              MR. VELARDE:  Objection to form.

18         A.   Sitting here today, that's become

19  apparent.

20         Q.   (BY MR. RAY) Okay.  Why haven't you paid

21  the note that is Exhibit 34?

22         A.   Well, I believe the note was extinguished

23  in foreclosure.

24         Q.   Do you know how foreclosures work in

25  Colorado?  If you turn to the second page, do you see

1    the deficiency stamp on the note?

2                    MR. RAY:  Let's go off the record.

3                    (Discussion off the record.)

4          A.    Generally I understand how a foreclosure

5    works.

6          Q.    (BY MR. RAY)  You understand that there

7    is a deficiency bid that if the sale doesn't satisfy

8    the debt, that the lender can come after the

9    deficiency amount?  Do you understand that?

10         A.    I understand that's a potential.

11         Q.    Okay.  And so why haven't you paid the

12   deficiency?

13         A.    I don't believe there is a deficiency.

14         Q.    Okay.  Well, the public trustee, the

15   government body, has certified here that there is a

16   deficiency.  And so you can take that up with Winter

17   Park and Grand County if you like, but barring your

18   belief there is not a deficiency, any other reasons

19   you haven't paid this?

20         A.    I believe the note was satisfied, one,

21   and --

22         Q.    By the foreclosure?

23         A.    By the foreclosure and, two, which

24   actually precedes what I just said, and that is that

25   Marquis was to be released from this agreement some 90

1    days after the July 20, '07 closing.

2         Q.   Okay.  And satisfied by the foreclosure.

3    You see the stamp on it, right?  I mean, I can show it

4    to you.  Do you have any -- how can you continue to

5    say that?  It's not there.

6         A.   Well, I understand that the Grand County

7    trustee's stamp, you know, on its face has

8    information, but I also know that that information --

9    because I've gone through a foreclosure from a

10   lender's perspective, that it would be the lender that

11   would provide that information based on appraisal to

12   the trustee.

13        Q.   Okay.  You had your buddy go do an

14   appraisal on that Winter Park property when he was

15   under contract, right?  Do you remember Joseph?

16        A.   No.

17        Q.   Joseph did an appraisal on the property,

18   right?

19        A.   No.

20        Q.   Okay.  You have copies of the appraisal

21   of the Winter Park property in your possession,

22   correct?

23        A.   Yes.

24        Q.   Any of them close to $1.8 million?

25        A.   I believe the final appraisal that

DAVID HAMILTON

```
1    Mr. Gallagher delivered was in the 1,640,000 range.

2         Q.    Recently.

3         A.    That was the most recent.

4         Q.    What was the date, 2010?

5         A.    No.   June, July, August of 2008.

6         Q.    Okay.

7               MR. RAY:   What did that just appraise

8    for?

9               MR. GALLAGHER:   What's that?

10              MR. RAY:  Winter Park.

11              MR. VELARDE:   Objection to form.

12              MR. RAY:   Go off the record.

13              (Discussion off the record.)

14              MR. RAY:   Back on.

15        Q.    (BY MR. RAY)  The only way it would not

16   be a deficiency is if the property is worth the amount

17   of the debt or more than the debt, correct?

18              MR. VELARDE:   Objection to form.

19        Q.    (BY MR. RAY)  I don't mean it to be a

20   legal conclusion, but that's --

21        A.    That's my general understanding.

22        Q.    Thank you.  When it went to foreclosure

23   sale, is it your testimony that your property was

24   worth 1.8 million?

25        A.    Yes.
```

1          Q.    Okay.  What did you base that on?

2          A.    Because it had just sold a few months

3    prior for -- there is a little discrepancy in the

4    price.  If you look at the contract, it's a 1,785,000.

5    If you look at the loan documents, it's a

6    million-eight, so we'll call it a million-eight.  It

7    had just sold in July of 2007 for a million-eight.

8          Q.    Which is a year earlier than the

9    foreclosure, correct?

10         A.    No.

11         Q.    Okay.

12         A.    The foreclosure, my understanding,

13   started the same year.

14         Q.    Okay.  So your basis of value is based on

15   the year before?  Strike that.

16               So your only dispute about the deficiency

17   amount is what you think the property is worth?

18               MR. VELARDE:  Objection to form.

19         A.    No, I didn't say that.

20         Q.    (BY MR. RAY)  What else is your dispute

21   about?

22         A.    Well, I'm saying, from the outside

23   looking in, the property, it sold for a million-eight

24   in July -- late July of 2007, and then goes into

25   foreclosure at the end of that same year, four or five

1    months later, did not drop $600,000 in value.

2         Q.    Well, do you know how foreclosures work?

3    People show up and they bid, and the price is what the

4    price is.  If you get someone to pay $5 for a property

5    worth 1.8 million, the property goes for $5.

6              MR. VELARDE:  Objection to form.

7         Q.   (BY MR. RAY)  Do you understand that?

8         A.   I understand what you said, but I don't

9    agree with it.

10        Q.    Why?  That's how this works.  We submit a

11   bid to the Grand County Public Trustee; it goes to

12   sale, it doesn't go to sale.

13        A.    You're coming from theory.  Reality, my

14   understanding is there is not a lot of people that

15   have, you know, a million-plus cash that they are

16   going to go to auction and buy these properties.

17   They'll wait until after, and, if they're interested

18   they will purchase them from the lender.  And that's

19   more the rule than the exception.

20        Q.    Okay.  So you thought it was satisfied by

21   the foreclosure, you thought Marquis would be

22   released.  What other reasons haven't you paid this

23   money?

24        A.    Well, I believe that the appraisal going

25   into the foreclosure was manipulated.

1          Q.    What does that have to do with your

2    paying this note?

3          A.    Well, I think if there is a bad faith act

4    on the lender, then, you know, that would relieve --

5          Q.    What was the bad faith?

6          A.    Well, I've since had an opportunity to

7    look at the appraisal, the pre-foreclosure appraisal.

8          Q.    I'm with you.  You sent me that.

9          A.    Yeah.  And there are statements reflected

10   in there that lead me to believe that.

11         Q.    You are not suing us for any of that

12   stuff, though, right?  I mean, I've read 586

13   paragraphs.  You haven't mentioned that, right?

14         A.    No.  That's information that we just

15   learned after the fact, but it's still goes to the

16   deficiency.

17         Q.    Okay.  Marquis being released.  Any other

18   reasons you haven't paid this?

19         A.    No.

20         Q.    Okay.  A couple more questions and then

21   we'll break for lunch and then I probably only have

22   another hour or two.

23         A.    I'm fine.

24         Q.    So I've asked Norma Walker about this

25   discussion about you being released from this note in

DAVID HAMILTON

117

1    60 to 90 days.  She just flat-out denies that

2    discussion ever happened.  Is that a case of her

3    lying, or is it perhaps that you are not sure of what

4    the contents of those discussions were?

5                    MR. VELARDE:  Objection to form.

6           A.    If I have to choose between the two?

7           Q.    (BY MR. RAY)  Exactly.

8           A.    The first.

9           Q.    Okay.  So when she is under oath

10   testifying to that fact and we have got no writings

11   and no correspondence corroborating that, your

12   testimony is that she is lying?

13                   MR. VELARDE:  Objection to form.

14          A.    And I believe that you'll find in the

15   documents that I produced there is e-mail

16   communications, and if you don't, then I will quickly

17   put those in your hands.

18          Q.    (BY MR. RAY) Wait a second.  There are

19   documents?  15,000 pages that I don't have documents?

20          A.    No.  I'm just saying that I believe --

21          Q.    You'll point to them.

22          A.    I believe that they're in there, and if

23   they were erroneously not put in there, I will produce

24   them.

25          Q.    That's fine.

DAVID HAMILTON

```
 1                    MR. RAY:  Let's take a lunch break.

 2                    (recess taken, 11:51 a.m. to 12:46 p.m.)

 3                    MR. RAY:  Back on the record.

 4           Q.   (BY MR. RAY)  I'm going to talk fast

 5     again.  She seems to do well.  I think we'll be out of

 6     here in an hour.

 7                    Let me make sure we have talked about all

 8     these properties here.  What is the current status of

 9     Marquis' interest in all these car washes currently?

10     I know you've got a deed of trust on Alameda; is that

11     correct?

12           A.   Yes.

13           Q.   What else is out there today, if

14     anything?

15           A.   I have a deed of trust remaining on

16     Colfax.

17           Q.   That's right.

18           A.   And a question mark -- and I can't

19     answer, because it's probably a legal determination,

20     but any recourse on Santa Fe.

21           Q.   Okay.  I'm with you.  Okay.  How much

22     money do you think MCW owes you?  And this isn't to

23     hold you to anything.  I assume -- I mean, you had a

24     bunch of notes outstanding to MCW.  You had that

25     master note in the Quinlan case.  They have to owe you
```

1   a few million.  No?

2           A.   6.6.

3           Q.   Okay.  What have you done to try to

4   collect that?

5           A.   Obtained a judgment against them.

6           Q.   And refresh my memory.  Was it in this

7   main case that you got a default judgment against

8   them?

9           A.   No.  I filed a separate action against

10  them in the Denver court.

11          Q.   And it was for breach of the master note?

12          A.   Right.

13          Q.   Okay.  So what have you done to try to

14  collect on that judgment?

15          A.   The court wanted -- just recently, within

16  the last few days, they sent a notice or a note to me

17  and wanted to have my background work or my schedule

18  that I worked up the figures.  They wanted that sent

19  to them.

20          Q.   So you don't have an actual judgment?

21  I'm not trying to be --

22          A.   I don't know, because it's been in their

23  hands.  I don't have access to electronic information,

24  so it may be in the mail back.  I did speak to the

25  clerk, and it was an error on the Court's part,

DAVID HAMILTON

```
1    thinking I couldn't sign an affidavit, because they

2    were I thinking was the attorney.  I said what about

3    pro se?  It's in the works.

4           Q.   Okay.  You haven't done any garnishments

5    or attached any wages?

6           A.   No.

7           Q.   Take a minute and think through.  I would

8    like to know what lies -- I'm going to use this

9    broadly -- lies, misrepresentations, untruths,

10   something along those lines, deception, that you

11   believe Mr. Gallagher or his entities committed in

12   this case.  And we go can property by property.  But

13   what I don't want you to answer anything that

14   Ms. Walker may have said through Mr. Gallagher.  We

15   can talk about all that.  Don't worry.

16              But for this question, fraud,

17   misrepresentation, lies or deception from

18   Mr. Gallagher, his attorney or Ms. Cook.  I know

19   that's a lot of questions, so we can break it all

20   down.  You can take your time, take a five-minute

21   break.

22          A.   Well, I would say going back to the first

23   meeting in June of 2007, first face-to-face

24   Mr. Gallagher and I had.

25          Q.   In California?
```

DAVID HAMILTON

121

1          A.    In California.  You know, we spent most

2    of the -- kind of a brief lunch meeting, but most of

3    the time, we were talking about the car that I was

4    looking to purchase, anticipating all the while that

5    Lakewood was going to close with cash coming from the

6    Culleys.  That is what had been represented.  And I

7    believe -- well, I know that Ms. Walker was present at

8    that meeting, and she confirmed that money was coming

9    out, so I was just looking for a short-term loan to

10   acquire this automobile.

11          He went home.  I think sometime early in

12   August, maybe August 10 or so, we have this series of

13   e-mail communications and phone conversations.  I had

14   initially talked about a need for 100,000, and then

15   some other financing wasn't available, so I requested

16   up to 175,000.  We discussed terms.

17          Q.    Real quick.  Were you getting a better

18   car?  You went from 100,000 to 175-.

19          A.    Same car.  Just the secondary financing

20   source dropped through, so . . .

21          Q.    Right.  But why would you need a loan

22   from 100- to 175,000?  If you're looking for a car and

23   you agree on a 100,000 loan, what caused you to almost

24   double that all of a sudden?  Was it a --

25          A.    The secondary financing that would have

 1    bridged the difference between the 175-, which was

 2    roughly the purchase price of the car, down to the

 3    100- that had been negotiated.  That 75- went away,

 4    so --

 5         Q.   You needed 75,000 more?

 6         A.   I need 75- more.  And I called him and we

 7    talked about it, and he countered and said, Yeah, I

 8    would rather do the other for no points.  We just

 9    talked about deal points and the terms.

10         Q.   Okay.  And ultimately it was agreed that

11    175,000 would be loaned?

12         A.   Yes.

13         Q.   Okay.  So what was the lie?  We're trying

14    to figure out the fraud, the misrepresentation.  And I

15    understand the first topic that we'll call is the

16    $175,000 loan, fair, as a topic?

17         A.   Uh-huh.

18         Q.   So the 175- loan or transaction.  What

19    specifically do you believe Mr. Gallagher, Ms. Cook or

20    Mr. Vanzant lied or misrepresented to you?

21    Specifically just them.

22         A.   The use of the money, basically.

23         Q.   Okay.  I didn't mean to cut you off.

24         A.   That's it.

25         Q.   So the use of the money.  What did

DAVID HAMILTON

123

1    Mr. Gallagher, specifically him, tell you he was going

2    to use the loan proceeds for?

3            A.    Well, he didn't say he was going to use

4    the loan proceeds.

5            Q.    So he didn't tell you --

6            A.    The loan proceeds were coming to the

7    borrower.

8            Q.    Part of them, right?  You signed a

9    settlement statement that said funds to borrow 24,000?

10           A.    Right.

11           Q.    Right.  So some of the funds were going

12   to go to you?

13           A.    Right.

14           Q.    Obviously, the other funds were not going

15   to go to you, right?

16           A.    That was going to go to Lakewood at

17   closing.

18           Q.    Did Mr. Gallagher ever tell you how he

19   would use the funds, him personally?

20           A.    No.

21           Q.    Okay.  Did Ms. Cook at any time tell you

22   how Emerald Isle or Mr. Gallagher would use the

23   175,000 loan proceeds?

24           A.    Before the closing, no.

25           Q.    Did Mr. Vanzant, before the closing, tell

1    you how the $175,000 loan proceeds would be used?

2            A.    No.

3            Q.    Okay.  So the three people from Emerald

4    Isle -- did you ever deal with anyone else at Emerald

5    Isle besides those three people?

6            A.    Yes.  My main contact was Dusty Williams.

7            Q.    Did Dusty Williams ever tell you how the

8    loan proceeds would be used?

9            A.    That, I don't recall if we had a specific

10   conversation about the loan funds being sent over to

11   Land Title.

12           Q.    If I told you that I've talked with her

13   and she says that she never made any promises or

14   representations to you, would that be different than

15   your recollection, or do you just not remember having

16   a conversation with her?

17                MR. VELARDE:  Objection to form.

18           A.    I just don't remember the specifics.

19           Q.    (BY MR. RAY)  So you don't remember a

20   single conversation from anybody at Emerald Isle or

21   Mr. Gallagher about how the loan proceeds would be

22   used, correct?  I think we just went through all four

23   of them.

24           A.    Right.

25           Q.    So you just -- I was just asking you

DAVID HAMILTON

125

1    what's the fraud, and you started with how they're

2    going to use the money.  You just got done confirming

3    for us that nobody from our side ever told you how

4    they would use the money.  So that isn't a reason

5    for -- I'm trying to understand.  What other reasons

6    did you believe they lied to you about this

7    transaction?  Use of the funds.

8              A.   Well, first of all, we can exclude from

9    that time frame any conversations, because there were

10   no conversations that I recall with Lance Vanzant or

11   Holly Cook.  But specific to Mr. Gallagher and I

12   leading up to that point, what we talked about was an

13   automobile loan, and after that point, we didn't talk

14   about the use of funds.

15             Q.   Right.  So Mr. Gallagher never told you

16   or promised you how he would use the funds for the

17   loan?

18             A.   Not other than the conversation -- if

19   we're limiting this to just our conversation, we had

20   conversation before that point that identified a

21   particular item.

22             Q.   Right.

23             A.   And then after that point, there was no

24   conversation, no contact by him to say, Wait a minute.

25             Q.   Mr. Hamilton, when you signed the closing

DAVID HAMILTON

```
 1    statement and the settlement statement, you knew you

 2    obviously weren't buying a car.

 3         A.   I understand that.

 4         Q.   Okay.  So obviously, the loan had nothing

 5    to do with the car at the time.

 6         A.   I understand.

 7         Q.   Okay.  And --

 8         A.   I'm just talking about the facts of the

 9    conversation.

10         Q.   I understand.  I'm trying to figure out

11    from you how you think we lied to you.  And you're

12    saying that there is a conversation about a car loan,

13    when at the time of the loan itself, you knew it had

14    nothing to do with the car.  There were discussions

15    before then.  What, at the time of the loan, did we

16    lie to you about or deceive you or trick you with

17    regard to the use of the funds?  What else?

18         A.   Just about the use of the funds.

19         Q.   Okay.  Just so we're clear, there is no

20    other misrepresentation, lies, deception that

21    Mr. Gallagher, Ms. Cook, Mr. Vanzant or anyone at

22    Emerald Isle made about the $175,000 loan except for

23    the use of funds?

24         A.   Let me ask you what time frame, if there

25    is time frame or --
```

DAVID HAMILTON

```
1          Q.    Going up to the loan, before.

2          A.    Going up to the foreclosure of the loan,

3    or no?

4          Q.    Going up to, say, September 4, 2008.

5          A.    The loan wasn't made until September 17,

6    but . . .

7          Q.    You can continue quibbling about dates.

8    That's fine.  The point is, other than the use of

9    funds, is there anything else that you say we lied to

10   you about?

11         A.    Not leading up to the 17th, no.

12         Q.    Okay.  So before the 17th, there was only

13   the use of funds, and you have no communication -- no

14   written communication that suggests how we were going

15   to use the funds, other than an e-mail about the car,

16   correct?

17         A.    E-mail and phone conversation.

18         Q.    But you have no e-mails from anyone on

19   our side that says, Here is how we're going to use the

20   funds, other than the one about the car, right?

21         A.    Right.

22         Q.    So if it wasn't our side that gave you

23   the impression on how the funds would be used, because

24   you had no communications other than the car with

25   anyone on our side, who gave you this idea that the
```

1    funds were going to go to pay contractors?

2         A.    Well, the information came from Norma

3    Walker.

4         Q.    Okay.  Norma Walker told you that.

5         A.    Basically in the form of e-mail

6    attachments that came to her from Mr. Vanzant.  I

7    believe Mr. Gallagher was on the heading of the

8    e-mail, and it discussed the Culley closing, whereby

9    Mr. Gallagher was going to carry back some $407,000 or

10   something to that effect, and that was within just a

11   day or two of closing.

12        Q.    Okay.

13        A.    And at that point in time --

14        Q.    What does that have to do with the 175-

15   and the representations made to you about where those

16   funds are going to go?  The whole reason -- you sued

17   us in federal court.  The whole reason your good

18   counsel had to spend time prior to July 4 in '09 is

19   because of the 175,000 loan and because of your

20   allegation that we lied to you about how those loans

21   would be disbursed.

22             And I'm asking you point-blank, other

23   than through Norma Walker and an e-mail, is there

24   anything else you have that suggests how we would use

25   those funds?

DAVID HAMILTON

```
1          A.    No.
2          Q.    Okay.  So we just got done talking about
3   the $175,000 loan, and I want to close on that.  No
4   other fraud, deception, besides the use of funds?  I'm
5   not being difficult.  I just want to give you any
6   other opportunities --
7          A.    Leading up to the foreclosure, yes, there
8   was.
9          Q.    Okay.  No problem.  We're going to break
10  that out as a separate transaction.  No problem.
11         A.    Okay.
12         Q.    Okay.  Are we good on the 175- loan, the
13  actual disbursement in terms of talking about our
14  fraudulent activity?  Is there anything else that you
15  would like to add about that loan?
16         A.    No.
17         Q.    And we're talking now, in general,
18  outside the 175-.  What else did we do to lie and
19  deceive you at any point in time throughout the case?
20         A.    Leading up to the foreclosure?
21         Q.    Uh-huh.
22         A.    I had requested and, through the title
23  company, a separate request went out to Emerald Isle
24  Lending for a payoff amount, and that payoff came
25  in -- I believe it was signed by Mr. Gallagher dated
```

DAVID HAMILTON

130

1    July 29 of 2009 -- for a specific amount.  We

2    delivered a check for that specific amount, actually,

3    a few hundred dollars over to cover a couple days'

4    interest, and the next day the property went to sale

5    and --

6            Q.    You delivered a check, is that what you

7    said?

8            A.    Yes.

9            Q.    To who?

10           A.    To the title company.

11           Q.    Dual Arch?

12           A.    Well, Dual Arch -- Old Republic Title was

13   working with Dual Arch.

14           Q.    Okay.  So you delivered the payoff check.

15           A.    Delivered the payoff check.  You have a

16   copy of that check.  And the next day, the property

17   went for sale, and the opening bid wasn't what was

18   represented on the July 29 statement.  It was $5,000

19   more, and so --

20           Q.    You put us through an entire month of

21   bankruptcy proceedings before that.  Do you remember

22   that?

23           A.    I do.

24           Q.    And we incurred attorneys' fees -- you

25   would imagine, my time is not free -- when we had that

1    hearing out in California?

2             A.   Yes.

3             Q.   So how did we lie to you?  You gave a

4    check to a title company, and how is that our fault?

5             A.   Well, I think a fair lender would honor a

6    payoff agreement or at least contact the borrower and

7    say, Wait, a minute.  We made a mistake.  We need to

8    add some fees.  And what I'm saying to you is 24 hours

9    before the sale, one figure was represented as being a

10   payoff, and I tendered a check in that amount to the

11   title company, only to find out the very next day it

12   had gone up $5,000.

13            Q.   Are you aware that you can't pay off a

14   loan that's in foreclosure?  There are certain

15   deadlines that you've got to actually make the payoff

16   by?

17                 MR. VELARDE:  Objection to form.

18            Q.   (BY MR. RAY)  You may not be familiar

19   with that.

20            A.   No, I'm not.

21            Q.   Okay.  You produced a copy of the payoff

22   check, you said?

23            A.   Yes.

24            Q.   In the 15,000 pages, or is that in the

25   set of e-mails that you forwarded to Mr. Velarde that

1   were not Bates-stamped, if that made any sense?

2           A.    I think it's in two places.  I think it's

3   in the 15,000 pages and I also believe it was in the

4   federal case.

5           Q.    So why did they reject your check?  If

6   you tendered a check -- this is the first we have

7   heard of that.  I'm sure it's been in the stack of

8   documents, but this is the first -- he has never heard

9   of it.  I've never heard of it.

10          A.    That's what sent me scrambling.

11          Q.    My point is, you gave a check to a title

12  company.

13          A.    For 266,000-plus dollars, which exceeded

14  a few hundred dollars over the demand that we received

15  the day prior to closing.  The lender personally

16  delivered it.  I was there.  He delivered the

17  cashier's check to Old Republic.  Old Republic

18  contacted Dual Arch.  They -- we have to assume for a

19  minute -- contacted their client, and we were told

20  that that check was not sufficient.  And the very next

21  day at noon, the property sold for 5,000 more than the

22  payoff that we were given the day before and nearly

23  5,000 more than the check that we had tendered before.

24          Q.    So did Old Republic send you a letter

25  saying, Your check is rejected?

DAVID HAMILTON

133

```
 1              A.   Oh, there was no time for letters.  They
 2    told me that they could not -- that that was not
 3    acceptable.  They couldn't either -- and I don't know.
 4    I don't know.  You would have to ask someone else to
 5    get the real truth behind who said no to the money,
 6    but you can imagine, from my perspective, you know, I
 7    was a little taken aback.
 8              Q.   Well, you have a cashier's check for
 9    200-some-thousand dollars, and you're concerned with
10    getting it back and making sure, Wait a second.  You
11    didn't accept this.  Why didn't you accept this?  You
12    didn't get any correspondence from them saying, Your
13    check is being rejected?
14              A.   The lender --
15              Q.   Who's the lender?
16              A.   Well, I was present at Old Republic
17    signing some documents when the lender came in with
18    the check and --
19              Q.   The lender for your refinance?
20              A.   The lender for my refi of the loan.  You
21    see their name on the check.  They, understanding the
22    urgency, walked the check over, which they almost
23    never do, but they did that.  And the next morning we
24    found out that the check was not acceptable.  It
25    didn't meet the payoff requirement.  And so basically
```

DAVID HAMILTON

134

1    I was being told to scrounge up another 5 grand within

2    a matter of hours, and it couldn't be done.

3            Q.    You didn't feel like doing it?

4            A.    I couldn't do it.

5            Q.    You didn't have the money?

6            A.    I didn't have the money.

7            Q.    So you had no money at the time of the

8    sale to actually pay off the loan?

9            A.    Not -- what?  No.  No.

10           Q.    You just told me that you were $5,000

11   short --

12               MR. GALLAGHER:  Can we go off the record?

13               MR. RAY:  Let me finish this.

14           Q.    (BY MR. RAY)  You told me that you were

15   $5,000 short, correct?

16           A.    That was your doing.  Your lender's or

17   your client's doing.  Not my doing.

18           Q.    Okay.  I'm asking the questions here.

19   You said you were $5,000 short, right, of the payoff,

20   the new revised increased payoff on the day of the

21   closing?

22           A.    No.  You are mischaracterizing my

23   testimony.

24           Q.    You brought a cashier's check to your

25   closing for 200-and -- fill in the blank.

DAVID HAMILTON

135

```
 1              A.    266,000.

 2              Q.    Let me finish.  You gave a check for

 3    $266,000.  Then you're told it's actually $5,000 more.

 4    Your testimony was it was too quick of a time frame to

 5    come up with the $5,000, correct?

 6              A.    Yes.

 7              Q.    You were unable to come up with the

 8    $5,000 the day of that closing, correct?

 9              A.    We had no idea --

10              Q.    Correct?

11              A.    Correct.

12              Q.    Okay.  So you did not have the ability to

13    fund the full payoff, the increased payoff, at the

14    time of closing?

15              A.    There was no increased payoff.  We asked

16    for a payoff, and on July 29, I walked into Dual Arch,

17    they gave me the payoff, I signed my name on it, and I

18    dated it that date.  That's the amount of the check,

19    plus a few hundred bucks extra just in case it, you

20    now, rolled over to the next day, there would be

21    sufficient funds.  The surprise came when they cried

22    the sale and the opening bid was $270,600, which was

23    exactly $5,000 more than the payoff that was given to

24    us previously.

25              Q.    Okay.
```

DAVID HAMILTON

136

1          A.    Now, there was no notice to us that the
2     price or the payoff had gone up.  So to answer your
3     question, the time that I had to raise 5 grand is the
4     time they start crying the sale until the time the
5     sale concluded with no bidders other than the lender's
6     bid.  So you're asking if I could get $5,000 in 10 or
7     15 minutes, and the answer is no.
8          Q.    Perfect.  Let's go off the record.
9                (Pause in proceedings.)
10         Q.    (BY MR. RAY)  We're going to just go
11    through some of these paragraphs of your answer here.
12    I'm just going to ask you some questions, if you don't
13    mind.  We'll start on page 16, paragraph 38.
14         A.    Okay.
15         Q.    The last sentence says, "Based upon
16    representations by Ms. Walker, Mr. Roberts and
17    Mr. Gallagher."  What statements did Mr. Gallagher
18    ever tell you about the options?
19         A.    Again, that was information coming
20    through the two names mentioned.
21         Q.    Okay.  So Mr. Gallagher did not make any
22    representations to you about the option, correct?
23         A.    I don't believe we had spoken at that
24    time.
25         Q.    Okay.  So the answer is yes, he did not

1    make any representations about the options?

2              A.    Yes.

3              Q.    Okay.  Paragraph 56, page 18.  It says,

4    "Ms. Walker represented to Marquis that if Marquis did

5    not sign as a tenant, Marquis would not have recovered

6    the money previously lent to MCW."  Do you see that?

7              A.    Yes.

8              Q.    Didn't you testify earlier it was your

9    idea to structure the lease and the options to provide

10   Marquis security?

11             A.    Yes.

12             Q.    So it was your idea, not Ms. Walker's, to

13   structure the lease-back transactions this way,

14   correct?

15             A.    Yes.  There was more to negotiations

16   rather than just the simple fact of sign or don't sign

17   on the lease.  And there was a time that I wasn't

18   liking the deal, and she reminded me that

19   Mr. Gallagher was already under contract, was going to

20   buy the properties, and so it started making more

21   sense.

22             Q.    Okay.  Page 21.  You knew prior to the

23   Culley closing that there was only $1.1 million in

24   cash coming to the table, correct?

25             A.    I found that out about two days before

1    closing.

2         Q.   Well, you testified during the Quinlan

3    trial that you -- and actually an e-mail was produced

4    giving you a copy of that contract in August.  Do you

5    remember that?  August 17.

6         A.   No.  What was given to me prior to that

7    was I was copied on the title company commitment, but

8    the actual contract didn't come to me until sometime

9    mid- to late December, I believe.

10        Q.   Right.  But you had extensive discussions

11   with Mr. Roberts during late August about the

12   structure of the Culley transaction, correct?

13             MR. VELARDE:   Objection to form.

14        A.   From about the 28th of August on, it

15   started -- it took on a bunch of different --

16        Q.   (BY MR. RAY)  That's fair.

17        A.   -- methods.

18        Q.   But on the 28th, you knew that there

19   wasn't going to be $3 million in cash from the

20   Culleys, correct?

21        A.   Right.

22        Q.   I mean, you knew through your

23   discussions, and you say it here in paragraph 103,

24   that Marquis wasn't getting cash out of this deal,

25   correct?  You knew you were getting a deed of trust.

DAVID HAMILTON

1           A.   At that point.  At that point, I believe

2     we were getting a deed of trust, and then it would be

3     pledged at the same time for a $1.3 million loan.

4           Q.   Gotcha.  So you knew you would get a deed

5     of trust upon the Culley closing that you hope would

6     be refinanced to pay you off?

7           A.   Yes.

8           Q.   Paragraph 105, the third sentence says,

9     "Marquis then called Mr. Roberts to express concern

10    that he was not involved in the transaction and was

11    not being given the opportunity to exercise the

12    Lakewood option."  Do you see that?

13          A.   Yes.

14          Q.   You never called Mr. Gallagher, correct?

15    It was only to Mr. Roberts?

16          A.   Yes.  About that topic, yes.

17          Q.   Okay.  And Mr. Roberts didn't own the --

18    hold the option, right; that was Mr. Gallagher?

19          A.   Correct.

20          Q.   Okay.  So why wouldn't you call up the

21    person holding your option and express concern

22    directly to that person about the transaction?

23          A.   Well, that's when I first learned the

24    true terms of the Culley transaction.  Up until that

25    time, I was led to believe that Marquis would be paid

1    in full, as others were led to believe the same.

2                  As soon as I found out that was not the

3    case, that they had, without my knowledge, prearranged

4    a $1.9 million seller carryback that was to go

5    directly to Mr. Gallagher being pledged for a

6    $1.3 million cash loan, yeah, I blew up and called

7    him.  That's what that conversation was about.

8          Q.   And you demanded that he assign to you

9    the $1.9 million carryback note that you got from the

10   Culley closing, right?

11         A.   For starters, yes.

12         Q.   For starters?  What else happened?

13         A.   Well, you know, I wanted to -- as far

14   as --

15         Q.   Besides ring his neck.

16         A.   Well, as far as I was concerned, you

17   know, embezzlement, a lot of things came to mind.

18         Q.   Sure.

19         A.   He had not led only myself but others to

20   believe that there was cash coming out of it.  You

21   know, after some investigating, they knew from the

22   onset -- because it says so in their contract -- that

23   there would not be cash coming out of it.

24         Q.   And you -- prior to that, you -- other

25   than the lease and the option, you didn't have any

DAVID HAMILTON

 1    security in the Lakewood property, correct?  Your

 2    1.7-plus million of construction funds were unsecured

 3    except through the option in their lease, correct?

 4          A.    Correct.

 5          Q.    And so if GGBC had sold the property to

 6    someone else entirely for cash and pocketed all of

 7    that money, there was nothing Marquis could have done

 8    about that, right, because you didn't have any

 9    interest in the Alameda property?  You didn't have a

10    deed of trust or anything securing that.

11          A.    I wouldn't go as far as to say there was

12    nothing Marquis could do about it.

13          Q.    What could you have done?  What do you

14    think your recourse would have been?

15          A.    Slipping into your scenario,

16    Mr. Gallagher is selling the improvements that he

17    doesn't own --

18          Q.    Well, let's clarify.

19          A.    -- to get up to the $3 million.

20          Q.    Where does it ever say in any of those

21    warranty deeds that you're just giving the land?

22    Everyone keeps saying that in every case, that

23    Mr. Gallagher is going to own the land, MCW is going

24    to own the buildings through your funds to construct

25    them.

```
 1              A.    Isn't that described in the lease?

 2              Q.    I'm just asking you where, because it's

 3     nowhere in the deed or --

 4              A.    I believe that ownership to the

 5     facilities, to the improvements, was spelled out in

 6     the lease.

 7              Q.    Okay.  So let's say he sells everything.

 8     GGBC sells everything and cuts Marquis out of the deal

 9     entirely.  What do you think your recourse would be?

10                   MR. VELARDE:  Objection to form.

11              A.    I would probably have to sue on the

12     lease, again, because GGBC didn't own the

13     improvements.

14              Q.    (BY MR. RAY)  Okay.  And neither did

15     Marquis, right?

16              A.    Marquis had an interest in the

17     improvements.

18              Q.    How?  You were funding --

19              A.    By the lease.

20              Q.    By the lease.  You were a tenant under

21     the lease.  You didn't have any interest in the

22     improvements under the lease.

23              A.    What does the tenant have on a ground

24     lease?

25              Q.    The right to possess the property and pay
```

1    rent on a monthly basis.

2            A.    And it owns the facility -- or the

3    improvements.

4            Q.    Okay.

5            A.    That's clear in the lease.

6            Q.    In the days before the closing of the

7    Culley transaction -- we went through all the e-mails

8    in the Quinlan trial.  You were aware of the -- you

9    disagreed vehemently, don't get me wrong.  Beg your

10   pardon.  But you were aware of the purchase price that

11   GGBC was requesting -- you say "demanding" -- for its

12   conveyance of the property to MCW, correct?  You saw

13   that e-mail where it breaks it down, the line items,

14   correct?

15           A.    I did see several e-mails, yeah.

16           Q.    And those e-mails -- just generally,

17   we'll talk about them.  I don't have them -- you know,

18   reflected the option payment of, I think, $970,000.

19   You'll recall there was a $90,000 -- what you guys

20   would call -- a lease termination fee.

21           A.    I didn't call it that.

22           Q.    We did, and you disagreed, because there

23   was no termination fee.

24           A.    Correct.

25           Q.    You remember the 90,000?

1          A.    Correct.

2          Q.    You remember the $20,000 that you say was

3    a commission -- or we say it's a commission, whatever.

4    The point is, you remember the 20,000?

5          A.    Yes.

6          Q.    Okay.  And do you remember the $882 of

7    lease payment that was a few days?  Do you remember

8    that?

9          A.    Yeah, but those communications didn't

10   come from the Gallagher camp.

11         Q.    No.  They came from Norma.

12         A.    Correct.

13         Q.    And I'm just making sure --

14         A.    I shouldn't believe those.

15         Q.    Well, you believe what you want to

16   believe.

17                Do you know how much money Mr. Gallagher

18   actually got out of the closing?

19         A.    No.

20         Q.    Okay.  He got $1,080,882, and that is the

21   sum of 970-, 90-, 20,000 and the 882.  That was the

22   figure the judge --

23         A.    I recall that.

24         Q.    -- ruled was the purchase price for GGBC.

25                MR. VELARDE:  Objection to form.

DAVID HAMILTON

```
1          Q.   (BY MR. RAY)  Do you disagree with that?

2          A.   I do disagree.

3          Q.   Okay.  Tell why you disagree with that.

4          A.   I think the judge's findings speak for

5     themselves.  If you have a copy, you can read it, but

6     I don't think it said that the purchase price was a

7     million-eighty.  I think the purchase price was 970-

8     and then it described 90,000 for a lease termination

9     fee and 20,000 for a brokerage fee or whatever, and

10    then 882 for miscellaneous.

11         Q.   You're too clever for your own good.  I'm

12    not trying to trick you here.  I am saying the money

13    GGBC received when it sold the property.  Call it

14    purchase price, call it the closing funds, it's --

15         A.   Well, I do draw a distinction between

16    purchase price and how much was received.

17         Q.   Okay.  How much was received is what I'm

18    talking about.

19         A.   Well, from -- I don't have personal

20    knowledge, but from what I've learned through the

21    various depos and trial, it was the 1,080,882.

22         Q.   Have you ever seen a different number?

23         A.   Not since all the litigation started out.

24         Q.   Okay.  You're making my life difficult

25    here.  So the 1,080,000 -- and you saw the e-mails
```

1    before the closing which itemized the 1,080,000,

2    whether you agreed with them or not, correct?

3         A.   I did see them, yes.

4         Q.   Okay.  So it wasn't a mystery to you

5    going into the Culley closing how much money -- call

6    it purchase price or proceeds -- GGBC was going to get

7    out of the deal?

8         A.   I knew what was represented, but I knew

9    that I was vigorously objecting to it.  And I was also

10   led to believe that there would be a formal lease

11   cancellation fee presented to me -- or a lease

12   termination document and I would have the opportunity

13   to sign it or not.

14        Q.   Mr. Gallagher didn't tell you that, did

15   he?

16        A.   It came from his attorney.

17        Q.   Lance Vanzant?

18        A.   Yes.

19        Q.   And I've never seen an e-mail that says

20   that.

21        A.   Yes.  It has an attached document that's

22   entitled "Agreement Regarding Repurchase" and it

23   spells out very --

24        Q.   Wait a second.  That was never signed.

25        A.   I didn't say it was signed.  I said that

DAVID HAMILTON

147

1    it was sent to me.  None of the e-mails that came to

2    me had anyone's signatures on them.  I'm just saying

3    the information that came out and where it came from.

4            Q.    So irrespective of the characterization,

5    you were aware of the proceeds that GGBC was demanding

6    in connection with the sale, correct?

7            A.    Yes.

8            Q.    You disagreed with them, correct?

9            A.    Yes.

10           Q.    Vehemently, correct?

11           A.    Yes.

12           Q.    And you still went through the closing

13   despite your objections, correct?

14           A.    Which closing, the 175- closing or --

15           Q.    I'm going to call the 175- closing and

16   the Culley closing -- for purposes of this, it's the

17   same thing.  I understand you weren't party to the

18   Culley closing, other than the fact that you got

19   $1.9 million in security out of the deal.  You knew

20   out of the entire transaction how much money GGBC was

21   to receive from the deal, correct?

22           A.    I knew what they were asking for, yes.

23           Q.    Perfect.  And you objected, but

24   notwithstanding your objection, you signed -- you

25   accepted the assignment from MCW for the $1.9 million

DAVID HAMILTON

1    deed of trust, correct?

2              A.    Yes.

3              Q.    And that was after the closing, correct,

4    a day or two or simultaneously?

5              A.    It was actually dated August 31, and it

6    was simultaneous with the closing, that's correct?

7              Q.    So you're objecting to this entire deal,

8    but you're accepting a $1.9 million deed of trust.

9    And then you signed the 175- closing on

10   September 17 -- or I think you signed it September 4

11   and it was funded the 17th.

12             A.    The final closing statement was

13   September 17.

14             Q.    And you signed those settlement

15   statements, right?

16             A.    Yes.

17             Q.    So notwithstanding your objections, you

18   closed on both the Culley deal, by accepting the deed

19   of trust, and signed the settlement statement in the

20   175- loan, notwithstanding your objections, correct?

21             A.    It's not as simple as that, but correct.

22             Q.    Paragraph 112.  When was your last

23   approximate disbursement from that Vectra account on

24   Lakewood, were you finding, right up to the closing

25   date?

1          A.    I think late June -- or it might have

2    been late July.

3          Q.    So there were obviously other bills that

4    were out there that, as we note, didn't get paid?

5          A.    Right.

6          Q.    Why wasn't Marquis funding those bills in

7    July when they were submitted?

8          A.    MCW had used up all the construction

9    funds that were available and, again, promised that

10   the funds would be replenished by the Culley closing.

11         Q.    So you knew, because the funds had been

12   dry, we'll call it, from the construction fund, that

13   there was no more money to pay contractors from

14   Vectra's account, correct?

15              MR. VELARDE:   Objection to the form.

16         A.    Correct.

17         Q.    (BY MR. RAY)   And if that runs out in

18   June -- obviously they're still doing some work in

19   July, still doing some work in August, correct?

20         A.    And I believe the last money came out in

21   July.  I think I corrected June.  I think it was July.

22         Q.    Obviously expenses were incurred

23   subsequent to then.  That's why Quinlan had that

24   $129,000 bill, unfortunately, correct?

25         A.    I think the expenses were incurred prior

1   to that.  I think Lakewood finished up in May.

2          Q.   But you knew that Quinlan had an

3   outstanding balance that couldn't be funded from

4   Vectra's construction fund, correct?

5          A.   Correct.

6          Q.   Okay.  And you knew that obviously some

7   other contractors hadn't been paid, that Stresscon had

8   filed a lien.  Do you remember that?

9          A.   Yes.

10          Q.   And so why would you, in paragraph 112,

11   tell the Court that "Mr. Roberts represented that as

12   of August 31, '07, all general contractors and

13   subcontractors who had provided materials or labor in

14   the construction of the facilities on the Lakewood

15   Property had been paid in full"?  Why would you have

16   believed Mr. Roberts when you had personal knowledge

17   yourself, as you just testified, that contractors

18   actually hadn't been paid?

19               MR. VELARDE:  Objection to form.

20          A.   Well, it takes my testimony a little out

21   of context.  What we were talking about was when

22   Marquis funded its remaining Vectra account in July,

23   did I know that there were still unpaid bills?  And

24   the answer to that is yes.

25          Q.   (BY MR. RAY)  Okay.

DAVID HAMILTON

1        A.   But I also understood that, concurrent

2   with the Culley closing, Mr. Gallagher was loaning

3   money sufficient to pay all these people.

4        Q.   That's not what this says.  It says that

5   Mr. Roberts told you they had been paid.

6        A.   Yes.

7             MR. VELARDE:  Objection to form.

8        A.   They had been covered.

9        Q.   (BY MR. RAY)  Well, did he tell you that

10  they had been paid as of August 31?  This was before

11  the closing or simultaneous with the closing.  I mean,

12  you knew going into the Culley closing that there were

13  unpaid contractors, right?

14       A.   Going into the Culley closing, yes.

15       Q.   Okay.  And did Mr. Roberts tell you that

16  those had been paid in full as of August 31 or not?

17       A.   Well, that's a yes-and-no answer.  Yes to

18  Stresscon and whatever the other contractor was.  I

19  don't recall.  But there were two contractors that

20  were on the closing statement or the settlement

21  statement showing to be paid.  Those are the ones that

22  I authorized the 175- loan to be paid.  And then

23  beyond that, he had indicated that he had a loan in

24  place with Mr. Gallagher that would, by the end of the

25  closing, take care of the balance of the contractors.

1        Q.   Okay.  That's not what this says, though,

2   right?  You would agree with that.  You're telling the

3   Court that he told you as of August 31 that they had

4   all been paid.

5             MR. VELARDE:  Objection to form.

6        Q.   (BY MR. RAY)  Isn't that what you're

7   saying right there?  Not that just Stresscon or GE

8   hadn't been paid.  You said "all contractors."

9        A.   Right.  That's what he represented.  And

10  I'm saying that I knew -- I had personally authorized

11  $51,000 to the contractors, and the remaining of it

12  was to come in that closing from a new loan.

13       Q.   We don't have to rehash this, because we

14  just went through it in the preliminary injunction

15  hearing, and the Court already made comments on this,

16  but I just want to be clear that -- never mind.

17            Mr. Gallagher never told you that the

18  175- loan would be used to pay contractors, did he?

19  Him specifically?

20       A.   No.

21       Q.   You never said, Steve, make sure that

22  this money only goes to pay contractors, did you?

23       A.   No.

24       Q.   Same questions for Holly Cook.  Did she

25  ever tell you that she would pay contractors or did

DAVID HAMILTON

1    you ever instruct her to only pay contractors?

2            A.    No.

3            Q.    Same question for Lance Vanzant.

4            A.    I never had a conversation, I don't

5    believe, with Mr. Vanzant.

6            Q.    Okay.  So everyone on what I'm saying is

7    our side of the litigation, you had no conversations

8    about how the funds would be used, yet you're suing us

9    for fraud.  What's your understanding of fraud -- when

10   someone defrauds you, what's your understanding of

11   what that means?

12               MR. VELARDE:  Objection to form.

13           A.    Well, you're indicating that no one from

14   your side told me that they were going to pay

15   contractors with those funds.  In my years of

16   experience, a lender was always obligated to tell the

17   borrower exactly how those funds were going to be

18   used, and that's missing.

19           Q.    (BY MR. RAY)  Okay.  So do you know what

20   it means -- I'll ask my question again.  What's your

21   understanding of what it means to commit fraud?

22   You're suing us for fraudulent misrepresentation that

23   Steve Gallagher told you something that was different

24   than what the actual facts were.  What did Steve

25   Gallagher, Holly Cook or Lance Vanzant tell you that

DAVID HAMILTON

154

1    was different than what the facts actually were at the

2    time?

3              A.    And we can include Dusty Williams in

4    that?

5              Q.    Please do.  That would be very helpful.

6              A.    Okay.  My conversations were with

7    Mr. Gallagher and Ms. Williams, and basically the

8    conversation we had that was kind of left open-ended

9    was that the money was to fund the automobile

10   purchase, and we know that didn't happen.  We talked

11   about that.

12             Q.    Hold on.  And you consented to that.

13             A.    I consented to that I would not purchase

14   the vehicle; that I would allow funds from the 175- to

15   pay these contractors and 51,000 went to Land Title.

16             Q.    So that wasn't a lie, because the car

17   proceeds we have talked about already.

18             A.    But what I didn't hear was, in addition

19   to the funding of the 51,000 to the contractors

20   directly to Land Title on behalf of those contractors,

21   that the balance would be used to pay a landscape

22   company and GGBC.

23             Q.    But wait a second.  You just testified

24   that before the closing, you had no -- it was crystal

25   clear in your mind, in fact, you vehemently disagreed

DAVID HAMILTON

155

1    with the proceeds that Mr. Gallagher was going to

2    receive on the Culley closing.  Do you remember that?

3         A.   But I didn't hear that from

4    Mr. Gallagher is what I'm saying.

5         Q.   I understand.  But you knew what he was

6    demanding.  You knew he was demanding $1,080,882.

7    Norma Walker sent you three e-mails that you just

8    confirmed that you received and knew about before the

9    closing, correct?

10              MR. VELARDE:  Objection to form.

11         Q.   (BY MR. RAY)  We can go back and read the

12    testimony.

13         A.   No.  I'm not trying to change anything.

14    I've got a series of e-mails -- received a series of

15    e-mails.  While the million-eighty didn't change, the

16    fact that Mr. Gallagher -- and, again, according to

17    the information source, and we know who that is,

18    Ms. Walker -- he was carrying back 400-plus thousand

19    dollars in a note, so he wouldn't need any money, any

20    additional dollars, because he was carrying that.

21    That was contained in the e-mail.  I don't know when

22    that changed.

23              The other thing that was in the e-mail --

24    and I received loan documents asking me to sign, and I

25    refused to sign, that was to pledge the $1.9 million

```
 1    note back to Emerald Isle in exchange for a $1.3

 2    million loan of cash to keep all these construction

 3    activities going.  And I refused.

 4          Q.   We're going to try to focus.  We're

 5    talking about the lies, the fraud, and you had

 6    indicated that we didn't lie to you about how we were

 7    going to spend the 175- -- we're sticking with the

 8    175-.  We didn't tell you, we didn't inform you how we

 9    were going to spend it.  Is that fair?

10          A.   That may be more accurate.

11          Q.   Okay.  So you were shocked when you

12    learned 145,000 of your loan went to Mr. Gallagher?

13          A.   Well, I don't know that it went to

14    Mr. Gallagher.

15          Q.   Or his entities.  You've seen the checks.

16          A.   Yes.

17          Q.   Both of those entities are Mr. Gallagher.

18    I'm not trying to cut you off.  I apologize.

19          A.   Yeah.

20          Q.   You knew 145,000 went over there

21    somewhere?

22          A.   Yes.

23          Q.   What did you think the settlement

24    statement meant when it said "internal payoff"?

25          A.   I believed that contractors were being
```

1    paid at closing and, in fact, 51,000 was paid to

2    contractors.  I made the assumption, based on my

3    experience, that Mr. Gallagher, as a seller, must have

4    left that money on the table for those contractors to

5    be paid, and so he was going to reimburse himself

6    through the various companies for the amount that was

7    withheld out of the Land Title closing.

8         Q.   That's based on nothing other than, as

9    you just testified, your assumption?

10        A.   Well, no.  I actually signed a settlement

11   statement saying that at that particular time, 51,000

12   had -- because I knew Culleys had closed.  It was

13   after the Culley closing.  51,000, at least, had been

14   paid to contractors, and Mr. Gallagher, through his

15   entities, was recouping money.  So it didn't shock me

16   that there would be additional funds paid out and that

17   would justify the internal payoff.

18        Q.   So you thought your money was going to

19   pay the two liens that popped up at closing, the GE

20   Enterprises and Stresscon?

21        A.   I thought it was going to pay the balance

22   of the contractors, realizing that the timing was such

23   that the Marquis 175- loan came after the Culley

24   closing, and so GGBC would have had to leave money on

25   the table to satisfy those contractors.

DAVID HAMILTON

1        Q.    Your testimony is you thought the 175-

2    was to pay all contractors?

3        A.    Well, not -- Marquis admittedly got some

4    money out of it, you know.

5        Q.    My point is that --

6        A.    There was the 145- or whatever.

7        Q.    And you thought the 145- was going to pay

8    every contractor at Lakewood?

9        A.    I believed that that money was going to

10   Land Title, just like the 51,000 did.

11       Q.    What did you think it was going to be

12   spent on?

13       A.    And based on the statements that I had at

14   the time, the settlement statement from the title

15   company, it showed all contractors being paid.

16       Q.    So when did you receive the copy of the

17   settlement statement?

18       A.    I think it's dated -- it's been through

19   all these depositions.  I think it's dated August 31,

20   and then over that holiday weekend --

21       Q.    And you received that?

22       A.    -- it changed.  I have a copy of it, yes.

23       Q.    When did you receive that?

24       A.    I would have to look back and see.

25       Q.    Did you receive it, you think, right

1    around the closing time?

2         A.   I think it was shortly after,

3    because shortly after the closing, the title company,

4    Sara Baros, contacted me and said, you know, am I

5    going to fund the balance of the contractors?  And I

6    told her that that loan was still in the works.  It

7    would probably close towards the end of September.  It

8    was closing on the 17th.

9         Q.   Okay.  So you received those settlement

10   statements around the time of the closing.  Let's go

11   to paragraph 115 of your answers here.  I'm sorry.

12   Page 23.

13        A.   Okay.

14        Q.   It says, "Despite numerous requests,

15   Ms. Walker, Mr. Roberts, Mr. Gallagher and MCW failed

16   or refused to provide copies of the August 31, 2007,

17   settlement statements" . . .  You just testified you

18   received those settlement statements.

19        A.   Not from these folks.  From the title

20   company.

21        Q.   So hold on.  So your argument is that you

22   had a copy of the settlement statements, but that you

23   didn't get another copy from Ms. Walker --

24             MR. VELARDE:  Objection to form.

25        Q.   (BY MR. RAY)  -- or Mr. Gallagher; is

1    that the argument?

2          A.    My recollection is when the title company

3    sent the Culley note and deed of trust, the assignment

4    and the allonge documents to Marquis, they included a

5    copy of the settlement statement, and so it came

6    sometime after closing.  Obviously the August 31

7    statement didn't hold water, because the closing

8    happened a few days later.

9          Q.    Sure.  And that settlement shows

10   disbursements to GGBC, right, the seller?  The

11   settlement statements show how much money they are

12   receiving?

13         A.    It showed all the contractors being paid

14   and it showed an amount to GGBC.

15         Q.    Right.  And it showed an amount to

16   FirstBank, remember that, the lender?

17         A.    652-.

18         Q.    Exactly.  You remember very well.  So you

19   had that.  You received that shortly after the

20   closing.

21         A.    Right.

22         Q.    And you knew Steve Gallagher was

23   demanding $1,080,882 before the closing.  Whether you

24   agreed with it or not, you knew that that's what he

25   was demanding.  If you add up the amounts on the

1    settlement statements that you looked at, it's

2    surprisingly short of $1,080,000 by the exact amount

3    of the internal payoff from your loan.  Does that

4    strike you as a coincidence?

5            A.    So the difference is 145-?

6            Q.    Roughly.

7            A.    I would have to -- I wouldn't be shocked

8    about it right now, because little shocks me these

9    days, but I'll go back and do the math.  I would be

10   curious how they would plug that in when the special

11   warranty deed was for 970-, and that's all the title

12   company knew was 970-, how it bumped up.

13           Q.    But you knew GGBC needed 1,080,000 and

14   you knew when you looked at the settlement statement

15   that there is just not enough money there to pay GGBC

16   1,080,000.

17           A.    As I testified, I received the August 31

18   statement with documents that had already been

19   recorded, so I know it came after September 6.  That's

20   the date that they actually recorded it.  That's why

21   the 175-, in part -- why the 175- loan didn't close.

22   My first -- I signed a note and deed of trust on

23   August 30.  It was intended to close concurrent with

24   Culleys, but there were a lot of moving parts that

25   didn't close then.  There were issues about what

1    insurance was being required.  We negotiated through

2    those.

3                I signed another statement, I believe, on

4    September 4 that was adding in the 51,000 to the

5    contractors that had actually liened that had to be

6    closed before -- or close concurrent with Culleys.

7                And then subsequent to that, I knew there

8    were additional contractors.  And the title company,

9    again, started calling me right away saying, When are

10   you going to get this other money in to us?  So I

11   explained that we were working on a loan that was

12   going to close sometime in September.  That's my

13   recall.

14         Q.   Okay.  So we lied to you about the

15   balance of the funds and where they would go.  I'm

16   just being vague on that.  Is there anything else

17   about the 175- loan, or can we move to another area?

18   I'm just trying to think of everything you can think

19   of that we deceived you or tricked you that's based on

20   your misrepresentation claims.  So we have got the

21   175- under wraps.

22         A.   We don't want to talk about a usury here,

23   right?

24         Q.   You can.  I'll give you a 60-second

25   sounding box just to --

DAVID HAMILTON

```
 1            A.    I'm not saying -- you just said if there
 2     was anything else that --
 3            Q.    That's not a -- I'll just say it's not a
 4     lie.  It's not a misrepresentation.  I'm with you.
 5     Illegal under, you know, your theory, I get it.  I'm
 6     talking about what we tricked you about.  We said
 7     something that's something else.
 8            A.    You said you would adhere to the maximum
 9     interest allowed in California and, in fact, charged
10     36 percent.
11            Q.    Okay.
12            A.    I would consider that.
13            Q.    That's fair.  What else?
14            A.    That's it.
15            Q.    Take your time.
16            A.    No.  That's it.  I'm good.
17            Q.    Well, we're going to go through these
18     hundreds of paragraphs here.  You allege a lot more
19     than just that in here.  Just take your time.  If you
20     want to talk with your counsel, use a bathroom break.
21                  But all I've got that we have lied to
22     you -- your entire fraudulent misrepresentation and
23     everything is based on the 175- loan and our usury
24     interest rates.  I'm encouraging you to take a minute
25     to think about it.  If you're ready to move on, we can
```

1    move on.

2              MR. RAY:  Now is a good time for a

3    restroom break.

4              (Recess taken, 1:49 p.m. to 2:03 p.m.)

5         Q.   (BY MR. RAY)  We are talking about the

6    fraud and the misrepresentation.  You mentioned the

7    175- loan, you mentioned usury.  You've had some time

8    to think.  What other misrepresentations, fraud, lies,

9    deceptions did Steve, Holly or Lance make to you?

10        A.   That's all I can think of right now.

11        Q.   Okay.  Paragraph 182, page 28.

12        A.   Okay.

13        Q.   Let's be clear.  Emerald Greeley, GGBC

14   II, GGBC, Emerald and Mr. Gallagher did not

15   misrepresent to you that you had to sign the

16   subordination agreement, correct?

17        A.   That information came from Ms. Walker.

18        Q.   Okay.  So again, Emerald Greeley, GGBC

19   II, GGBC, Emerald and Mr. Gallagher did not

20   misrepresent to you the contents of paragraph 182?

21        A.   No.

22        Q.   And you testified earlier that Norma

23   Walker was not the agent of Mr. Gallagher or his

24   entities?

25              MR. VELARDE:  Objection to form.

DAVID HAMILTON

165

```
 1          Q.   (BY MR. RAY)  Was there anyone else that

 2     told you this in 182?

 3          A.   No.

 4          Q.   Okay.  So sitting here today, you cannot

 5     state or allege that Emerald Greeley, GGBC II, GGBC,

 6     Emerald, Mr. Gallagher or his agents misrepresented

 7     this to you, correct?

 8               MR. VELARDE:  Objection to form.

 9          Q.   (BY MR. RAY)  You can state that Norma

10     Walker misrepresented it to you.

11          A.   Relative to the subordination agreement?

12          Q.   Yes.

13          A.   Yes.

14          Q.   Okay.  Now, in paragraph 183, it says

15     that Emerald Greeley, GGBC II, GGBC, Emerald and

16     Mr. Gallagher misrepresented that you had to sign the

17     various leases.  Do you see that?

18          A.   Yes.

19          Q.   That was also Ms. Walker who made that

20     representation to you, correct?

21          A.   Yes.

22          Q.   And it was not anyone associated with

23     Emerald, GGBC or Mr. Gallagher that made that

24     representation to you, correct?

25               MR. VELARDE:  Objection to form.
```

DAVID HAMILTON

1           A.   Well, I felt at the time it was an

2     association.  I mean, information is coming from

3     Ms. Walker.

4           Q.   (BY MR. RAY)  And you testified

5     Ms. Walker is not an agent of Mr. Gallagher or his

6     entities.  In your allegation in here in 183, it says

7     it was his entities or him or his agent that

8     intentionally misrepresented this to you.  And I'm

9     asking you who it was other than Ms. Walker.

10               MR. VELARDE:  Objection to form.

11          A.   No one.

12          Q.   (BY MR. RAY)  No one?  Okay.  So it is

13    not accurate as written, 183, correct?

14               MR. VELARDE:  Objection as to form.

15          Q.   (BY MR. RAY)  By the way, people get

16    things wrong in complaints all the time.  I'm not

17    suggesting that you said something wrong --

18          A.   You learn as time goes on, too.

19          Q.   Exactly.  So sitting here today, the

20    information in 183, with the knowledge that you have

21    today, is inaccurate, correct?

22               MR. VELARDE:  Objection as to form.

23          A.   I would say yes.

24          Q.   (BY MR. RAY)  Okay.  Paragraph 184, it

25    says that Emerald, Mr. Gallagher and/or his agent

```
1    intentionally misrepresented that Marquis only needed

2    to sign a note -- I'm paraphrasing -- for 60 to 90

3    days.  Do you see that?

4         A.   Yes.

5         Q.   Let's be clear.  Emerald never told you

6    that, correct?

7         A.   Correct.

8         Q.   Mr. Gallagher never told you that,

9    correct?

10        A.   Right.

11        Q.   His agents never told you that, correct?

12             MR. VELARDE:  Objection as to the form.

13        Q.   (BY MR. RAY)  Just so that we're clear --

14   well, strike that.

15             So Mr. Gallagher didn't tell you that.

16   Who told you that information in 184?

17        A.   Ms. Walker.

18        Q.   Okay.  Ms. Walker and only Ms. Walker,

19   correct?

20        A.   Yes.

21        Q.   Okay.  Why don't you sue Ms. Walker for

22   all these lies that she told you?

23        A.   Well, I believe the information that she

24   was relaying to me was coming from Mr. Gallagher or

25   his entities.
```

1          Q.   How do you know?  You said you couldn't

2     trust a word she said.

3          A.   As I sit here today, I understand that.

4     But early on in these transactions, there had been no

5     reason to dispute her word or her actions.

6          Q.   Okay.  186, Mr. Gallagher and/or his

7     agent misrepresented -- I'm paraphrasing -- that the

8     Lakewood property could not be sold for 1031 purposes

9     for a period of time.  Do you see that?

10          A.   Yes.

11          Q.   Mr. Gallagher never made that

12     representation to you, correct?

13          A.   No.

14          Q.   Who's the agent, then, that you are

15     referring to?

16          A.   Ms. Walker.

17          Q.   Anybody else?

18          A.   I think Ms. Walker was the main source.

19          Q.   Okay.  187, "Mr. Gallagher intentionally

20     misrepresented that he was not a licensed real estate

21     broker."  When did he tell you that he was not a

22     licensed real estate broker?

23          A.   Well, I don't think that he -- this isn't

24     saying that he told me that he wasn't.  He did not

25     tell me that he was.

1          Q.    No.  This says he intentionally

2     misrepresented that he was not a licensed real estate

3     broker.  When you are saying somebody misrepresented

4     something, you're saying they told you facts that are

5     different than they actually are.

6                MR. VELARDE:  Objection as to form.

7          Q.   (BY MR. RAY)  And here you are saying he

8     told you he was not a real estate broker.  When did he

9     tell you that?  Or maybe he didn't.

10         A.    No.  It just wasn't disclosed on

11    documents.

12         Q.    Okay.  Do you know of any requirement of

13    disclosing the fact that you're a broker?

14         A.    My recollection, and I don't know how

15    it's applicable here, but there is a Colorado Real

16    Estate Rule E-25, I believe, that deals with when a

17    broker is supposed to acknowledge his status or his

18    license.

19         Q.    So if I were to show you three prior

20    contracts that you had entered into with

21    Mr. Gallagher's entities that predated this that

22    discloses that he's a real estate broker, would you

23    take that back?

24                MR. VELARDE:  Objection as to form.

25         Q.   (BY MR. RAY)  That you signed, documents

1      that you reviewed.

2              A.    Prior to the leases?

3              Q.    Uh-huh.

4              A.    I don't have any recollection of entering

5      into agreements with Mr. Gallagher prior to this.

6              Q.    Okay.   188, and we have been through

7      this, so we'll be very brief.   You say Mr. Gallagher

8      or his agent misrepresented that Marquis would need to

9      borrow 175,000 regarding Lakewood.   Mr. Gallagher

10     never represented that to you, correct?

11             A.    No.

12             Q.    GGBC never represented that to you,

13     correct?

14             A.    No.

15             Q.    And who's the agent you are referring to?

16             A.    Norma Walker.

17             Q.    Did anyone else tell you that besides

18     Ms. Walker?

19             A.    I believe Mr. Roberts had a conversation

20     with me about that.

21             Q.    Anyone other than MCW have that

22     conversation with you?

23             A.    Not that I can recall.

24             Q.    So why are you saying that we

25     misrepresented or we intentionally deceived you?

DAVID HAMILTON

```
 1           A.    It says "or his agent."

 2           Q.    Right.  You just said --

 3           A.    At the time, I believed, as I just

 4    testified, that it came from Ms. Walker, and she was

 5    working with or for Steve or working with his

 6    attorney.

 7           Q.    Okay.  You are suing Mr. Lambright.  Did

 8    you know that?

 9           A.    Yes.

10           Q.    When did you ever talk with

11    Mr. Lambright?

12           A.    I haven't.

13           Q.    You said he misrepresented something to

14    you.  If you've never talked to him, how can you say

15    he misrepresented something to you?  Page 34.

16           A.    I was just going to ask you.

17           Q.    No problem.

18           A.    Again, believing that Ms. Walker was

19    acting as the agent of that entity --

20           Q.    Who told you that?

21           A.    Ms. Walker?

22           Q.    No.  Who told you that she was an agent

23    for Joseph Lambright?

24           A.    Well, she was representing the

25    documents -- she was bringing the documents to me.
```

DAVID HAMILTON

172

1          Q.    No, no.  Who told you that she was an

2     agent for Joseph Lambright?  I understand she brought

3     you documents.

4          A.    Okay.  No one specifically told me.

5          Q.    You are telling the Court Mr. Lambright

6     or his agent did this, and you had no basis to believe

7     that at the time.  You just testified that Norma was

8     Mr. Lambright's agent.

9               MR. VELARDE:  Objection to the form.

10          Q.    (BY MR. RAY)  You have to have a basis

11     for when you say these things.  What's your basis

12     based upon?

13          A.    At the time that these documents were

14     coming to me, I was receiving e-mail that had

15     Mr. Vanzant on the e-mail that he and Ms. Walker were

16     working these documents up, and through her I received

17     them.

18          Q.    What does that have to do with

19     Mr. Lambright?

20          A.    Well --

21          Q.    You're saying Mr. Lambright -- you're

22     telling the Court here, Your Honor -- this isn't even

23     upon information you believe.  You are making a

24     definitive statement here.  Your Honor, Joseph

25     Lambright -- Norma Walker is an agent for Joseph

DAVID HAMILTON

1    Lambright.

2              I'm trying to figure out if you've never

3    talked to the guy, Norma Walker never told you she was

4    his agent, you never saw an e-mail that said she was

5    his agent.  What's the basis to tell the Court that

6    Norma is his agent?

7              MR. VELARDE:  Objection to form.

8         A.   Well, I would believe that if somebody is

9    preparing documents on the other party's behalf, you

10   know, as being tied into their counsel, that they're

11   an agent.

12        Q.   So you're just guessing?

13        A.   No.  I mean, that's my belief.

14        Q.   Because someone is cc'd on an e-mail,

15   that they're an agent?  I'm trying to define what you

16   understand.

17        A.   When there is back-and-forth

18   communication between Ms. Walker and Mr. Vanzant and

19   they are preparing documents to present to me, I know

20   that she is not my agent.

21        Q.   Right.

22        A.   So in some capacity, she has to be

23   working for someone.

24        Q.   Right.  And wasn't MCW involved in every

25   one of these deals?  That's why she is involved is

DAVID HAMILTON

174

1    because she's the principal or one of the principals

2    for MCW.

3              MR. VELARDE:  Objection to form.

4         A.   She is involved in MCW.  She also -- I've

5    seen numerous times that she gets a commission as a

6    broker.

7         Q.   (BY MR. RAY)  For MCW, right, always the

8    seller's broker?

9         A.   I don't know.  I've just -- I've seen the

10   settlement statements regarding the Winter Park

11   exchange, so I don't know.  It could be.

12        Q.   So it was just Ms. Walker.  I'm just

13   making sure.

14             We're getting close.  Thank you for your

15   patience.

16             (Deposition Exhibit 42 was marked.)

17        Q.   I've never seen an electronic

18   verification page before.  Could you just certify to

19   me on the record that that's your signature and you've

20   read all this and it's all true and accurate to the

21   best of your knowledge?

22             MR. VELARDE:  You actually have a copy of

23   that, don't you?  We brought one today.

24             MR. RAY:  A signed copy?

25             MR. VELARDE:  Yes.

```
1               A.   If you would like a copy that's

2    notarized --

3               Q.   (BY MR. RAY)  I don't need a copy.  I

4    just want --

5                    MR. RAY:  Off the record.

6                    (Discussion off the record.)

7                    MR. RAY:  Back on the record.

8               Q.   (BY MR. RAY)  You took some time, I

9    assume, to sit down and read these and compile your

10   responses?

11              A.   To the best of my ability, yes.

12              Q.   Okay.  For all these responses, starting

13   with paragraph -- or page 19, I'm asking you to

14   identify all of the misrepresentations.  They all

15   start with Ms. Walker represented to Marquis that

16   Mr. Gallagher, Mr. Gallagher through Ms. Walker

17   represented to Marquis.  Response, Mr. Gallagher

18   through Ms. Walker represented to Marquis.

19                   Are there any misrepresentations made

20   directly by Mr. Gallagher, Mr. Vanzant or his

21   entities?

22              A.   At what time frame?  Are you talking the

23   whole --

24              Q.   Yeah.

25              A.   I would say just the -- you know, around
```

DAVID HAMILTON

1    the Culley closing, not communicating where the funds

2    were actually going.

3         Q.   Let's stop on that.  You testified you

4    didn't talk to Mr. Gallagher, Holly Cook or Lance

5    Vanzant about where those funds were going, correct?

6         A.   Well, the only conversation I had was

7    prior to when we were talking about the car loan, and

8    we have gone through that.

9         Q.   Right.  So fast-forward.

10        A.   So the next event that I would say would

11   be the --

12        Q.   No, no.  We're still on the first event.

13   You're saying we misrepresented the use of the loan

14   proceeds when you testified, I think three times, that

15   it wasn't us.  It was Ms. Walker and Mr. Roberts that

16   told you the funds would go to the contractors,

17   correct?

18        A.   That's true.

19        Q.   Okay.  So Mr. Gallagher, Ms. Cook, GGBC,

20   Lance Vanzant never misrepresented anything to you

21   about the use of those funds, correct?

22        A.   That's true.

23        Q.   Okay.  So taking use of the funds off of

24   the misrepresentation list, we all agree we didn't

25   misrepresent to you the use of the funds.  What's

DAVID HAMILTON

1    next?  What did they, Gallagher and his entities,

2    specifically misrepresent to you?  And you can take

3    your time.  Feel free.

4              A.    The payoff on the 175-.

5              Q.    The payoff.  What about it?

6              A.    Signing the payoff demand and not

7    accepting the money.

8              Q.    I think I only have one follow-up after

9    today, and I actually won't put it on Sean.  I'll put

10   it on.  If you could just point to me the copies of

11   those checks or the check that you gave to the title

12   company when you tendered the payment of the 266-.

13   You said you produced a couple copies of it.  That

14   would be great.

15             A.    Okay.

16             Q.    That's the only follow-up?

17             A.    The easiest source would be to look at

18   the federal case.

19             Q.    Do you think there are exhibits to the

20   response you just filed?

21             A.    Yes.  If you look at the exhibit list,

22   that will take you right to it.

23             Q.    Perfect.  Thank you.

24                   So the payoff demand.  How did we lie to

25   you by giving you the payoff demand of 266-?

DAVID HAMILTON

```
 1            A.   Well, it obviously wasn't the correct

 2   amount.

 3            Q.   Okay.  So the payoff.  What else?

 4   Incorrect amount.  Let's be clear.  That was just

 5   Emerald Isle Lending?

 6            A.   Correct.

 7            Q.   Okay.  No other entity of

 8   Mr. Gallagher's?

 9            A.   No.

10            Q.   Not him individually?

11            A.   No.

12            Q.   Okay.

13            A.   That's all I can think of right now.

14            Q.   The only fraud and the only

15   misrepresentation that we're dealing with for two and

16   a half years of litigation is something that occurred

17   two years after you actually filed the lawsuit?

18                MR. VELARDE:  Objection to form.

19            Q.   (BY MR. RAY)  We have been here two and a

20   half years, Mr. Hamilton.  586 paragraphs say fraud,

21   fraud, fraud, fraud, fraud.  We just got done going

22   through what this fraud is, and the only thing you can

23   identify is a payoff demand that happened in July of

24   2009, which is a year and a half after the lawsuit.

25   Where is the other fraud that you told the Court about
```

1    for all these years?

2                MR. VELARDE:  Objection to form.

3          A.   All of those allegations in the beginning

4    also apply to Norma Walker as an agent, and at that

5    time I believed that she was an agent.  She never told

6    me otherwise.  The first time I heard that she wasn't

7    was in the conjunctive relief hearing, and then I

8    think she has been deposed maybe a time or two and

9    testified at the Quinlan trial, and so I don't know if

10   that was out of convenience or if that was the real

11   truth.

12         Q.   (BY MR. RAY)  Well, you just got done

13   saying earlier that you agree that Norma Walker was

14   not the agent of GGBC.  We can go back and read that

15   on the record.

16               MR. VELARDE:  Objection to form.

17         A.   I agree that that's what she said.  I

18   heard her say it numerous time and --

19         Q.   (BY MR. RAY)  Mr. Hamilton --

20         A.   -- so that's what I believe today is that

21   she is not.

22         Q.   Okay.  That's what I'm saying.  Sitting

23   here today.

24         A.   I believe, based on what I know today,

25   her testimony in other documents and things that I

```
 1    have seen, that she was not the agent.

 2            Q.    Okay.  So sitting here today, we have got

 3    580 paragraphs of allegations that -- I don't want to

 4    say everything, because this payoff demand isn't

 5    anywhere in the new answer.  You can put it in.  All

 6    582 paragraphs that say fraud, fraud, fraud, fraud,

 7    fraud, fraud are based solely on comments made from

 8    Ms. Walker to you that you, now sitting here today,

 9    acknowledge she was not an agent for Mr. Gallagher?

10            MR. VELARDE:  Objection to form.

11            A.    I'm saying that today I believe that she

12    was not an agent.

13            Q.    (BY MR. RAY)  And you can't point to any

14    misrepresentation, lie, deception, other than the July

15    payoff, that Mr. Gallagher and any of his entities,

16    Holly Cook, Lance Vanzant made to you?

17            MR. VELARDE:  Objection to the form.

18            A.    Yes.

19            Q.    (BY MR. RAY)  That is true?

20            A.    That is true, that I couldn't make that

21    determination right now.

22            Q.    Okay.  So every time in your answer here

23    where it says Mr. Gallagher misrepresented something,

24    don't you think we need to amend that to say it was

25    Norma Walker, who is not the agent of GGBC or
```

DAVID HAMILTON

181

1     Mr. Gallagher, that told me these things?

2               MR. VELARDE:  Objection to form.

3          Q.   (BY MR. RAY)  I don't --

4          A.   You're asking for a procedural --

5     something that I would get with a lawyer and ask,

6     but --

7          Q.   (BY MR. RAY)  Strike that.  We'll go a

8     different way.  As we go through lawsuits, at the

9     beginning you write things down that you think are

10    true and then we have discovery -- and just bear with

11    me for two and a half seconds.  We uncover facts that

12    sometimes we thought were different than what they

13    actually were.  It happens to everybody.

14               What I'm hearing today is that at the

15    outset, when you filed your answer and counterclaims,

16    that the information before you suggested that Norma

17    Walker was an agent or some way affiliated with

18    Mr. Gallagher or his entities.  Is that fair?

19         A.   Yes.

20         Q.   Okay.  And now we have gone through,

21    unfortunately, several trials -- or one trial, several

22    depos, and now with the evidence that you have seen,

23    you have formed the belief that Norma Walker is not

24    the agent of GGBC or the entities, sitting here today?

25               MR. VELARDE:  Objection to form.

1              A.    I believe that's highly probable.

2              Q.    (BY MR. RAY)  Okay.  And in all 500-some

3    pages -- 500-some paragraphs, don't we need to tell

4    the Court that Ms. Walker, since you believe that here

5    today, is not the agent of GGBC and Mr. Gallagher?

6    Don't we need -- and I'm not suggesting any legal

7    mumbo jumbo.  Don't we need to tell the Court that

8    about three-quarters of what you've written down here

9    is not in accordance with what you believe today?

10             MR. VELARDE:  Objection to form.

11             Q.    (BY MR. RAY)  And I'll talk about the

12   three-quarters.

13             A.    That would be something for me to discuss

14   with counsel.

15             Q.    (BY MR. RAY)  Okay.  And I can't find

16   anything in here, because the payoff demand is not in

17   here, the July '09 payoff.  I can't find any other

18   misrepresentations by anyone on Mr. Gallagher, GGBC,

19   anyone -- I just want to make sure.  We have got 13

20   claims for relief and -- tell me the substance.  What

21   do you have against Mr. Gallagher or GGBC,

22   specifically?  What did they lie to you about?

23             A.    We just talked about that.  I mean, it's

24   something --

25             Q.    The payoff?

DAVID HAMILTON

```
 1              A.   We talked about that, but we also talked

 2     about something for me to consider now, knowing what I

 3     know today.

 4              Q.   You can say there is no other.

 5              A.   That would have read much differently if

 6     it had been written last week.  Beyond that, I don't

 7     know what to say about it.

 8              Q.   That's fair.  So moving forward, the only

 9     misrepresentation -- I don't want to say claim,

10     because that's legal.  The only misrepresentation that

11     you're accusing specifically Mr. Gallagher and his

12     entities of is the deception for the 2009 payoff,

13     correct?

14              MR. VELARDE:  Objection to form.

15              Q.   (BY MR. RAY)  And I've asked this five

16     times.  You said yes.

17              A.   Yeah.  I just want to be clear that you

18     said deception in there, didn't you?

19              Q.   I did.  All I meant was you've got

20     counterclaims that say fraudulent misrepresentation.

21     Fraudulent misrepresentation, negligent

22     misrepresentation.  I'm saying deception, lies, fraud.

23     Your basic claim -- you have a couple of them.  Your

24     basic claim is that we lied to you, we deceived you

25     into thinking you needed to sign leases when you
```

1   didn't really need to sign leases and signing options

2   and vice versa.  So yes, deception is part of it.  I'm

3   trying to figure out, of this last 30 pages, what's

4   the deception, what's the misrepresentation from our

5   side?  And if it's nothing but the 2009 payoff, we'll

6   move on.

7        A.   Well, it's that and the time just shortly

8   after the Culley closing, I felt and still feel that

9   Mr. Gallagher had the duty to let the borrow know what

10  they were doing with the funds.

11       Q.   But you said they never told you what

12  they were doing with the funds, right?

13       A.   Well, I don't know that you have to

14  deceive people by words.  Silence can deceive people.

15       Q.   Did you ask Mr. Gallagher, Hey, where are

16  these funds going?

17       A.   Yes.  After the fact.  I mean, after it

18  was funded and the money didn't go into Land Title,

19  there were numerous communications with Mr. Vanzant.

20       Q.   Before.

21       A.   No, no, because you can't ask what went

22  wrong before it went wrong.

23       Q.   As a borrower, you are taking out

24  $175,000 and you're not going to say, Where is this

25  money going?

DAVID HAMILTON

185

1          A.   Well, I signed one statement that showed

2     51,000 being paid.  I knew the rest of it would be

3     paid after closing.  That's what I believed.

4          Q.   From who?

5          A.   The funds from the 175- loan would go to

6     Land Title.  Land Title expected to receive funds.

7          Q.   Slow down.  Who told you Land Title was

8     expecting to receive funds?  Did you talk to Sara

9     Baros who closed the loan?

10         A.   Yes.

11         Q.   And she told you that she expected to

12    receive funds of 175,000 from the loan?

13         A.   Well, shortly after closing, she sent

14    e-mails to me asking when the funds for the balance

15    was coming in, and I responded that it's coming in

16    shortly, and they were in panic mode.

17         Q.   Okay.  So before the closing, you didn't

18    ask Mr. Gallagher or anyone on our side what the funds

19    were for?

20         A.   No.

21         Q.   Okay.  So how can we misrepresent

22    something to you that you never even asked about?

23              MR. VELARDE:  Objection to form.

24         Q.   (BY MR. RAY)  You are saying we lied and

25    we used it for a different purpose.  You stipulated

DAVID HAMILTON

186

1    you never even talked to us.

2         A.   And I also said I felt deceived by the

3    silence.  I think a lender would have an obligation to

4    say, Look, we're not paying your bills.  We're going

5    to pocket the money.  We're going to pay the landscape

6    company.  We're going to do whatever.  There is

7    nothing in the loan documents that authorized them to

8    disburse funds the way they disbursed them.

9         Q.   Wait a second.  Wait a second.  You

10   already pulled the promissory note out.  There is

11   nothing in there that restricts the use of the funds

12   anywhere in the note, is there, that says it's going

13   to go to pay contractors?  It doesn't say that.

14        A.   No.  I'm saying it doesn't say that it

15   can be used for other purposes either.

16        Q.   That's fine.  So the payoff of the 175-,

17   the use of funds, we talked about.  Anything else?

18        A.   That's it.

19        Q.   Okay.  So all the stuff about

20   misrepresenting, about signing the leases, we have

21   been through that.  We can take that off the table,

22   right?

23        A.   I'll talk to counsel.  There may be

24   issues in there from both sides that could shorten the

25   complaint or shorten the issues.

DAVID HAMILTON

187

1          Q.   Okay.  This will be my only question
2    about the federal lawsuit.  But you know that you
3    represented to the federal court as well that
4    Mr. Gallagher lied to you about the use of the
5    proceeds, the loan proceeds.  That's your allegation
6    in the federal lawsuit?
7          A.   Yes.
8          Q.   And sitting here today, now that you've
9    said on the record that that is actually not true,
10   that Mr. Gallagher never told you how the loan
11   proceeds would be used, don't you think we should
12   correct that, too?
13         A.   I'll take a look at that, but I thought
14   it went to the events that occurred after the Culley
15   closing.
16         Q.   You also said in that federal
17   complaint -- which you filed in December, right, or
18   late November?
19         A.   Yeah.
20         Q.   Well after the Quinlan trial?
21         A.   Yes.
22         Q.   Well after the preliminary injunction
23   hearing we had?
24         A.   Yes.
25         Q.   Well after you knew that Norma Walker was

1    not the agent of Steve Gallagher?

2                   MR. VELARDE:  Objection to form.

3              Q.    (BY MR. RAY)  At the end of November you

4    knew that?

5              A.    Yes.

6              Q.    Okay.  So why did you tell the Court that

7    Mr. Gallagher or his agents, namely Miss Walker -- his

8    agents in the federal lawsuit when, as you just

9    testified, you knew at the time you signed it that she

10   was not his agent?

11                  MR. VELARDE:  Objection to form.

12             A.    Well, I still have questions.

13             Q.    (BY MR. RAY)  You still have questions.

14   What do you mean?  You can't have it both ways.  I'm

15   not being difficult.  You testified that you knew at

16   the time you filed that federal complaint, based on

17   the depositions, the transcript, everything, that

18   Norma Walker -- that your personal belief, questions

19   or not, was that they were not agents of each other,

20   and you told the federal court under no uncertain

21   terms that she was his agent?

22                  MR. VELARDE:  Objection to form.

23             Q.    (BY MR. RAY)  Why did you do that?

24             A.    Because of the -- again, because of the

25   e-mail communications.  You know, I don't purport to

DAVID HAMILTON

1    be an expert on what constitutes "agency."  I believe

2    that she lied not only to me, but to Mr. Gallagher.

3    You know, I had conversations about that topic.  But

4    the federal case has additional claims and things that

5    are not in front of us here in this claim.

6            Q.   Well, what is in front of us in this

7    claim is the 175- loan?

8            A.   Right.

9            Q.   And that is what was at issue in the

10   federal court.

11           A.   Right.

12           Q.   They are directly tied to each other.

13   And you're saying when you filed the federal

14   complaint, you based your assertion that Ms. Walker

15   was an agent of Mr. Gallagher on e-mails?

16           A.   I do have a number of e-mails that would

17   lead me to believe, yes.

18           Q.   But you had formed the opposite belief,

19   as you said, even though you had some evidence that

20   goes the other way.  You had formed the honest belief

21   in your heart of hearts that they weren't agents.  Why

22   on earth would you tell a federal court something that

23   is different than what you honestly believe inside?

24   Irrespective if you can make a frivolous argument,

25   you've seen some e-mails or whatnot, you concluded in

1    your own mind that something is one way and you tell

2    the court something different.

3              MR. VELARDE:  Objection to form.

4         A.    Well, I think with the numerous e-mail

5    communications, with the preparation of documents,

6    working with Lance Vanzant, you know, if a federal

7    judge says that is not qualified as to a particular

8    allegation as to an agency relationship, then that's

9    fine.

10        Q.    (BY MR. RAY)  That's what he said.

11        A.    At my level, I don't want to make that

12   determination.

13        Q.    But you already had at the time you filed

14   the complaint.  I asked you.  Had you already

15   concluded that they weren't agents?  And you said,

16   Yeah, based on -- I've lived this for two and a half

17   years.  Now I know they're not agents.  I'm really

18   struggling with this.

19             MR. VELARDE:  Objection to form.

20        A.    If there is another -- you know, like I

21   said, I don't purport to be an expert on it, so if

22   there is agency by, you know, some other avenue of

23   preparing documents for a party, that's yet to come.

24   We're not through discovery.

25        Q.    (BY MR. RAY)  You testified that Norma

1   Walker, you believe, is not the agent of GGBC or

2   Mr. Gallagher, correct?

3            A.    Sitting here today from what I've

4   gathered.

5            Q.    You told the federal court, Norma Walker

6   is an agent of Mr. Gallagher, correct?

7            A.    I would have to look back at the --

8            Q.    Take my word for it.  Those are two

9   inconsistent statements.  Okay?  So sitting here

10  today -- and that's fine if you've changed your mind

11  since you filed the federal complaint.  That's fine.

12  Sitting here today under oath, can you say to the

13  federal judge that you believe Norma Walker is the

14  agent of Steve Gallagher or any of his entities?

15           MR. VELARDE:  Objection to form.

16           A.    Sitting here today, I would probably say

17  not.

18           Q.    (BY MR. RAY)  Okay.  You realize your

19  entire federal lawsuit is based on the premise?

20           MR. VELARDE:  Can we stop this for a

21  second?  I know there is a lot of 175- in here, but

22  all of these have been taken largely out of this case.

23           MR. RAY:  Thank you, Sean.

24           (Deposition Exhibit 43 was marked.)

25           Q.    (BY MR. RAY)  We're just going to through

DAVID HAMILTON

192

1   some e-mails.  We'll be out of here, like I said, an

2   hour ago.

3            A.    Okay.

4            Q.    Did you receive that e-mail?

5            A.    Yes.

6            Q.    What was your response?

7            A.    I'm not sure if I did respond.

8            Q.    Well, if someone sent you an e-mail

9   saying you're responsible for payments on a lease that

10  you thought you had no financial obligation to pay,

11  wouldn't you pick up the phone and say, What the hell

12  is this all about?

13           A.    Is that how you read this?  I don't read

14  that he is saying that Marquis is responsible.

15           Q.    "We owe the money"?

16           A.    "We" and "partner."  I mean, those are

17  two words that I wish never existed, because -- if you

18  can tell me that "we" meant Mercury and Marquis or

19  "we" being Dan and Norma collectively trying to get

20  money together for MCW or some of their other

21  partners, I would understand that.

22                 I do have another e-mail, and if you

23  don't have it, I'll put it in your hands very quickly,

24  that makes it very clear from the onset that MCW is

25  responsible for the payments to Mr. Gallagher.  In

DAVID HAMILTON

193

1    fact, e-mails between Roberts and Mr. Gallagher

2    saying, I will get you paid.  And if you don't have

3    them, Mr. Gallagher should have them since they were

4    e-mails to him.  I can produce them.  But he wasn't

5    talking about Marquis.

6              Q.   Okay.

7              A.   We're not aligned here, because he is my

8    borrower and Marquis is the lender.

9              MR. RAY:  Let's go off the record for

10   just a few minutes.  I'll look through my notes and

11   get you on your way.

12             (Recess taken, 2:47 p.m. to 2:50 p.m.)

13             MR. RAY:  That's it.

14             WHEREUPON, the within proceedings were

15   concluded at the approximate hour of 2:50 p.m. on the

16   7th day of February, 2011.

17

18

19

20

21

22

23

24

25

DAVID HAMILTON

194

```
1              I, DAVID HAMILTON, do hereby certify that I

2    have read the above and foregoing deposition and that

3    the same is a true and accurate transcription of my

4    testimony, except for attached amendments, if any.

5              Amendments attached   (  ) Yes   (  ) No

6

7

8

9              _____

10             DAVID HAMILTON

11

12

13             The signature above of DAVID HAMILTON was

14   subscribed and sworn to before me in the county of

15   _____, state of Colorado, this _____ day of

16   _____, 2011.

17

18

19             _____

20             Notary Public
               My commission expires

21

22

23

24

25   Stephen P. Gallagher, et al. 2/7/11 (mh)
```

DAVID HAMILTON

195

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER  )

       I, MARCHELLE HARTWIG, Certified Shorthand Reporter and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DAVID HAMILTON was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 16th day of February, 2011.

       My commission expires April 19, 2013.


___X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

February 16, 2011


David Hamilton
7423 River Nine Drive
Modesto, California 95356

Re:  Stephen P. Gallagher, et al. v. Mercury Car Wash,
     et al.
Deposition of:  David Hamilton

Dear Mr. Hamilton:

Your deposition in the above-entitled case has now been
transcribed.  If you would like to read and sign your
your transcript, either at our office or securely online,
please call our office to make an appointment.  In order to
comply with the statue, you have 30 days from the date of
this letter to read, sign, make changes, if necessary, and
have the signature page notarized.

Thank you for your attention to this matter.

Sincerely,

Kathy Accuenaga, Filing Assistant
HUNTER + GEIST, INC.
Court Reporting, Legal Videography, and Videoconferencing

c:  Brian T. Ray, Esq.
    D. Sean Velarde, Esq.